# United States Tax Court

T.C. Memo. 2025-3

YOSEF SEHATI a.k.a. JOSEPH SEHATI AND LILLY
KOHANIM-SEHATI, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 23585-17, 23593-17,        Filed January 15, 2025.
23594-17, 25174-18,
25175-18.

————

*Philip Garrett Panitz*, for petitioners.

*Michael W. Berwind*, *Albert B. Brewster II*, *Eric M. Herskovitz*, *Sarah A. Herson*, *Nathan C. Johnston*, and *Christiane C. Sanicola*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 3

FINDINGS OF FACT ..................................................................... 8

I.    Family .............................................................................. 8

II.   Emigration from Iran and Israel ....................................... 9

III.  JFJ.................................................................................... 9

IV.  SJC ................................................................................... 10

---

[1] Cases of the following petitioners are consolidated herewith: Shahbaz Sehati and Anna Demidova Sehati, Docket Nos. 23593-17 and 25174-18; and Shahrokh Sehati and Farahnaz Makabi-Sehati, Docket Nos. 23594-17 and 25175-18.

**[*2]**

V.    SJS ................................................................................. 11

VI.   Barukh ........................................................................... 12

VII.  Personal Bank Accounts.................................................. 12

VIII. Jamshid.......................................................................... 13

IX.   Tax Reporting and Examinations .................................... 14

OPINION................................................................................ 17

I.    Gift Jewelry Story............................................................ 17

II.   Evidentiary Matters ........................................................ 20

      A.   Exhibit 835-P: Jewellery Studio Invoices ............................. 21

      B.   Exhibit 836-P: Iranian Invoices....................................... 22

      C.   Exhibit 839-P: Logbook ............................................... 26

III.  Evaluation of Evidence.................................................... 27

IV.   Analysis.......................................................................... 28

      A.   Unreported Income ...................................................... 29

      B.   Guaranteed Payments .................................................. 42

      C.   NOL Carryforward Deductions ....................................... 44

V.    Penalties ......................................................................... 48

      A.   2012–14: Fraud Penalties........................................... 49

           1.   Joseph ........................................................... 51

           2.   Lilly ............................................................. 53

           3.   Shahbaz......................................................... 53

           4.   Anna ............................................................. 54

           5.   Shahrokh........................................................ 56

[*3]    6.    Farahnaz.......................................................... 57

    B.    2015 and 2016: Accuracy-Related Penalties.......................... 58

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, *Judge*:  Joseph[2] and his wife Lilly own a company operating two jewelry kiosks in a California shopping mall.  Joseph's brothers, Shahbaz and Shahrokh, who once worked for that business, now own a separate company operating a jewelry store within walking distance of that mall.  In addition Joseph, Shahbaz, and Shahrokh together own two separate companies, one that invests in residential real estate and another that invests in commercial real estate.  When respondent's agent examined the returns of Joseph, Lilly, Joseph and Lilly's jewelry company, and Joseph, Shahbaz, and Shahrokh's real estate companies, she discovered a bank account previously undisclosed to her.  That bank account and others received numerous deposits of unreported income that she determined belonged partly to Joseph and Lilly's jewelry company and partly to Shahbaz and Shahrokh's jewelry company.  Perhaps unsurprisingly, the scope of the examination expanded to include the returns of Shahbaz and Shahrokh's jewelry company, as well as Shahbaz, his wife Anna, Shahrokh, and his wife Farahnaz individually.

Respondent—wielding a stack of canceled checks and other bank records—maintains that Joseph and Lilly failed to report substantial sums from their jewelry business as income for 2012–14 and that Shahbaz, Anna, Shahrokh, and Farahnaz did the same with respect to Shahbaz and Shahrokh's jewelry business. Petitioners present a united front and urge us to conclude that the unreported income was nontaxable because it allegedly derived from sales of jewelry items originally received as gifts from Joseph, Shahbaz, and Shahrokh's mother; furthermore, they allege those sales were for amounts equal to or below the alleged gift jewelry items' adjusted bases.  Although

---

[2] For clarity in this Opinion, we refer to each petitioner and to other members of their family who are not petitioners (including Jamshid Sehati and Mohtaram Baroukh Sehati) by their first names.  Joseph is also known as Yosef, Yousef, Josef, or Shahram.  Lilly is also known as Loeiz.  Shahbaz is also known as Shahar.  Shahrokh is also known as Shah.  Jamshid is also known as Nader.  We use only the names Joseph, Lilly, Shahbaz, Shahrokh, and Jamshid for them in this Opinion.  We do not intend to convey any disrespect through these usages.

**[\*4]** petitioners' description of the alleged gifts conjures up images of a treasure trove of gold and jewels, petitioners never mentioned this remarkable theory during the examination to respondent's agent, who was instead told by two of them that the income represented loan or inheritance proceeds.

Respondent also argues that petitioners have not substantiated net operating loss (NOL) carryforward deductions they claimed (for 2012–14 for Joseph and Lilly and for 2012–16 for the other petitioners). Separately, respondent further asks us to determine that Shahbaz and Anna received a section 707(c)[3] guaranteed payment from their rent-free use of a residence owned by one of Joseph, Shahbaz, and Shahrokh's real estate companies during 2012–14. Petitioners counter that they substantiated the NOL carryforward deductions, and Shahbaz and Anna further argue that they did not live at the residence in question for part of the period respondent determined they did. Finally, the parties dispute the applicability of section 6663 fraud penalties, which respondent determined for 2012–14, as well as section 6662 accuracy-related penalties, which respondent determined in the alternative for 2012–14 and as his primary penalty position for 2015 and 2016.

Petitioners have not proven their theory of the case, and we will uphold respondent's determinations on all of the nonpenalty issues (except to the extent respondent has conceded otherwise).[4] We also uphold fraud penalties on four of the six petitioners for 2012–14 but not on Anna or Farahnaz. Finally, we uphold accuracy-related penalties on Shahbaz, Anna, Shahrokh, and Farahnaz for 2015 and 2016. We note that Joseph and Lilly's 2015 and 2016 taxable years are not at issue in these cases.

We will give a procedural overview of these cases before turning to our Findings of Fact. On August 17, 2017, respondent determined

---

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

[4] Respondent has made concessions about the amounts of unreported income properly attributed to petitioners, as well as the disallowed amount of an NOL carryforward deduction claimed by Shahbaz and Anna. *See infra* notes 21, 39.

[*5] deficiencies in petitioners' federal income tax and section 6663 fraud penalties for taxable years 2012–14 as follows:

Docket No. 23585-17—Joseph and Lilly

| Year | Deficiency | § 6663 Penalty |
|---|---|---|
| 2012 | $587,659 | $440,744 |
| 2013 | 563,844 | 422,883 |
| 2014 | 347,030 | 260,272 |

Docket No. 23593-17—Shahbaz and Anna

| Year | Deficiency | § 6663 Penalty |
|---|---|---|
| 2012 | $240,470 | $180,352 |
| 2013 | 163,865 | 122,898 |
| 2014 | 231,038 | 173,278 |

Docket No. 23594-17—Shahrokh and Farahnaz

| Year | Deficiency | § 6663 Penalty |
|---|---|---|
| 2012 | $135,958 | $101,968 |
| 2013 | 134,962 | 101,221 |
| 2014 | 135,886 | 101,914 |

Respondent also determined accuracy-related penalties under section 6662(a) in the alternative for petitioners' 2012–14 taxable years. Petitioners timely filed Petitions on November 13, 2017, contesting respondent's determinations. Respondent later modified the amounts of some of his determinations during these proceedings. *See infra* notes 21, 39.

In addition on September 21, 2018, respondent determined deficiencies and accuracy-related penalties under section 6662(a) against Shahbaz, Anna, Shahrokh, and Farahnaz for their 2015 and 2016 taxable years as follows:

**[\*6]** <u>Docket No. 25174-18—Shahbaz and Anna</u>

| Year | Deficiency | § 6662(a) Penalty |
|---|---|---|
| 2015 | $5,685 | $1,137 |
| 2016 | 6,527 | 1,305 |

<u>Docket No. 25175-18—Shahrokh and Farahnaz</u>

| Year | Deficiency | § 6662(a) Penalty |
|---|---|---|
| 2015 | $5,378 | $1,075 |
| 2016 | 3,884 | 776 |

On December 19, 2018, Shahbaz, Anna, Shahrokh and Farahnaz timely filed Petitions contesting respondent's determinations for their 2015 and 2016 taxable years. All five cases were consolidated pursuant to Rule 141 for purposes of trial, briefing, and opinion.

On January 31, 2024, the parties filed a Stipulation of Settled Issues in which they agreed to the proper amounts of some of the adjustments at issue and to the appropriate resolution of certain legal issues. Petitioners' Simultaneous Opening Brief, however, does not address certain issues that remain unresolved even after the filing of the Stipulation of Settled Issues. Specifically, petitioners' Simultaneous Opening Brief does not make any argument about (1) respondent's determination that Joseph's Fine Jewelers (JFJ) failed to report $130,097 of income from gold sales in 2013, (2) respondent's determination that Sehati Jewelry Couture (SJC) failed to report $135,466 of income from gold sales in 2013, (3) a $29,225 method of accounting adjustment respondent made with respect to Barukh Group (Barukh) for 2012, (4) respondent's determinations to reallocate $80,000 and $120,000 of income from SJC to Barukh pursuant to section 482 for 2013 and 2014, respectively, or (5) respondent's determinations to disallow deductions for certain alleged expenses of SJS Group (SJS) and Barukh for 2012–14.[5] None of these issues was resolved by the

---

[5] Petitioners argue in their Simultaneous Reply Brief that their Simultaneous Opening Brief addressed SJS's "deductions for repairs, maintenance, taxes, licenses, interest payments, and depreciation for tax years 2012, 2013 and 2014." This argument is without merit because petitioners have cited only a portion of their Simultaneous Opening Brief that addresses adjustments to "Shahbaz's income" of "$48,000 per year" for 2012 and 2013 and $46,000 for 2014 (i.e., the guaranteed payments issue addressed *infra* OPINION Part IV.B).

[*7] Stipulation of Settled Issues,[6] and petitioners needed to address them in their Simultaneous Opening Brief if they wished to preserve any arguments about them. Petitioners addressed some of those issues for the first time in their Simultaneous Reply Brief, but their belated engagement with those issues subverts our briefing schedule and takes respondent by surprise. Accordingly, we deem petitioners to have conceded their challenges to respondent's determinations on those issues. *See Considine v. Commissioner*, 74 T.C. 955, 969–70 (1980) (characterizing as "untimely" and thus declining to consider an argument advanced for the first time in a reply brief); *Ashkouri v. Commissioner*, T.C. Memo. 2019-95, at *24 n.9 ("Having conceded an issue by failing to advance a meaningful argument on that issue in their opening brief, [the taxpayers] could not withdraw that concession by belatedly including a cognizable argument in their reply brief."); *see also Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007) (stating that litigants "waived [an] argument by raising it for the first time in their reply brief").

The remaining issues for decision[7] are:

(1) Whether Joseph and Lilly failed to report income from JFJ for 2012–14;

(2) Whether Shahbaz, Anna, Shahrokh, and Farahnaz failed to report income from SJC for 2012–14;

(3) Whether Shahbaz and Anna failed to report guaranteed payments from their personal use of SJS's partnership property as a residence for their 2012–14 taxable years;

(4) Whether (i) petitioners are entitled to NOL carryforward deductions for their 2012–14 taxable years and (ii) Shahbaz, Anna, Shahrokh, and Farahnaz are entitled to NOL carryforward deductions for their 2015 and 2016 taxable years;

---

[6] Petitioners' Simultaneous Opening Brief does, however, make arguments concerning the taxability of a distribution from SJS to Joseph and Shahbaz. Nonetheless, this issue was resolved by the Stipulation of Settled Issues, and we do not address it further.

[7] We distinguish the remaining issues for decision from the remaining computational issues, which include (but are not necessarily limited to) the computational issues respondent identified in his Simultaneous Opening Brief. We will require these computational issues to be addressed through Rule 155.

**[*8]**

(5) Whether petitioners are liable for fraud penalties (or, in the alternative, accuracy-related penalties) for their 2012–14 taxable years; and

(6) Whether Shahbaz, Anna, Shahrokh, and Farahnaz are liable for accuracy-related penalties for their 2015 and 2016 taxable years.

As already stated, we sustain respondent's determinations on these issues (other than to the extent respondent has conceded otherwise), except that with respect to the fifth issue and pursuant to section 6663(c), Anna and Farahnaz are not individually liable for the fraud penalty. We also address deferred evidentiary rulings.

FINDINGS OF FACT

The parties have filed a First Stipulation of Facts, a First Supplemental First Stipulation of Facts, a Second Supplemental First Stipulation of Facts, a Third Supplemental First Stipulation of Facts, and accompanying Exhibits. We incorporate by this reference the Stipulation of Settled Issues, the Stipulations of Facts and their accompanying Exhibits, and any Exhibits admitted at trial, except to the extent set forth herein. Petitioners resided in California when they filed their Petitions.[8]

I. *Family*

Joseph, Shahbaz, and Shahrokh are brothers and third-generation jewelers. They have other siblings who are not parties to these cases, including Jamshid, who resides in Israel and whose deposition testimony is in evidence. Their father died in 1968, and their mother, Mohtaram, died in 2018. Joseph is married to Lilly, Shahbaz is married to Anna, and Shahrokh is married to Farahnaz. Mosh Mehrnia, who has been petitioners' accountant since 2000, is petitioners' brother-in-law.[9]

---

[8] Unless otherwise agreed by the parties in writing, *see* § 7482(b)(2), venue for an appeal is the U.S. Court of Appeals for the Ninth Circuit, *see* § 7482(b)(1)(A).

[9] Specifically, Mr. Mehrnia is married to Joseph, Shahbaz, Shahrokh, and Jamshid's sister.

[*9] II.    *Emigration from Iran and Israel*

Joseph moved from Iran to the United States in 1975. Shahrokh moved to the United States in 1977. After completing high school, Shahrokh attended Bowman Technical School in Lancaster, Pennsylvania, to learn jewelry making, as well as the Indiana University of Pennsylvania to study "[f]ine arts and metal."

Mohtaram, Jamshid, and Shahbaz fled Iran in 1979[10] in the wake of the Iranian Revolution and settled in Israel. Mohtaram had been in the jewelry business in Iran sometime before the Iranian Revolution. Shortly before leaving Iran, Mohtaram purchased gemstones and jewelry to take with her to Israel. Joseph began working at Weisfield's Jewelers in 1981.

Shahbaz moved to the United States in 1986. Mohtaram came to the United States in 1987 and at some point began working in jewelry stores in downtown Los Angeles.

III.    *JFJ*

In 1987 Joseph opened JFJ as a single kiosk selling jewelry.[11] JFJ's business later came to include a second kiosk. The kiosks are in a shopping mall in Ventura, California, and are approximately 300–400 feet apart. On June 22, 2001, Joseph organized JFJ as a California limited liability company. On July 15, 2001, Joseph, Shahbaz, and Shahrokh signed JFJ's operating agreement. In 2001 Joseph owned a 65% interest in JFJ, Shahbaz owned a 17.5% interest in JFJ, and Shahrokh owned a 17.5% interest in JFJ. Shahbaz and Shahrokh worked at JFJ until 2008. During 2012–14, Joseph owned a 70% interest in JFJ, and Lilly owned a 30% interest in JFJ. Before May 10, 2012, JFJ had a Rabobank checking account with an account number ending in 2418 (Rabobank 2418). On May 10, 2012, JFJ closed

---

[10] This finding is based on a stipulated fact. Jamshid testified that Mohtaram actually left Iran "[d]uring the last months of the year 1978" and that he had left Iran before her in 1978. Nonetheless, the stipulation is not clearly erroneous in view of the entire record, so we will not disregard it. *Cf. Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989) (holding that we are not obliged to accept a stipulation between the parties when it is clearly contrary to facts disclosed by the record or there is substantial evidence contrary to it). In any case, the difference between the stipulation and Jamshid's testimony is immaterial for purposes of this Opinion.

[11] There is no evidence about how Joseph acquired JFJ's opening inventory.

[*10] Rabobank 2418 and reopened it as a Rabobank checking account with an account number ending in 1381 (Rabobank 1381).

During 2012–14 JFJ issued customers a receipt for each sale, and it kept a corresponding sales invoice. JFJ did not have a machine or system to generate the sales invoices or receipts, so they were all handwritten. JFJ employed approximately 30–40 people during 2012–14, and three or four employees would work at a single kiosk at any given time. Joseph did not personally maintain JFJ's books or produce sales, inventory, or expense records.

Lilly worked at JFJ part time during 2012–14. She has been an alumni member of the Gemological Institute of America (GIA) since 2007 and holds a Graduate Colored Stones Diploma, Graduate Diamonds Diploma, and Graduate Gemologist Diploma from the GIA. During 2012–14 Lilly performed sales-related tasks at JFJ. She would be considered the most senior employee while she was working, and she left sales invoices she wrote behind for JFJ's staff to handle at the end of the day. Lilly held herself out as an owner of JFJ on a 2004 loan application. She has also executed interspousal transfer deeds in respect of residential properties that Joseph purchased.

IV.   *SJC*

On December 8, 2009, Shahbaz and Shahrokh incorporated SJC as a California corporation. Shahbaz and Shahrokh each own half of SJC's stock. Since 2010 SJC has operated a jewelry store in Ventura, California. SJC's store is, in Shahbaz's words, "about 1,000 feet" or a "five minutes' walk" from the shopping mall where JFJ's kiosks are.

Shahbaz dealt with the "financial aspects of things" at SJC, including sales and financial records. SJC promoted checks and credit cards to its customers as methods of payment. In February 2010 SJC opened a Rabobank checking account with an account number ending in 4263 (Rabobank 4263). SJC continued to use Rabobank 4263 through at least January 2015. During 2012–14, SJC used a software program to manage sales and inventory. Shahbaz, however, admitted that SJC conducted "sloppy bookkeeping."

Shahrokh's work at SJC focused on custom jewelry design, especially computer-aided design. Shahrokh was not involved with managing SJC's finances or with sales. Shahbaz "env[ied]" Shahrokh because he "was behind the bench . . . and having fun" and "not going through any of those transaction[s]."

[*11] Anna is a chemical engineer by training, but she worked at SJC during 2011–17. She worked at SJC for about ten hours per week on average during 2012–14. Her duties included sales, marketing, and administrative and bookkeeping work. Anna also made entries into SJC's computerized inventory management system during 2012–14. The inventory information she entered included the suggested retail price of items for sale.

Farahnaz worked at SJC during 2011–17, where her duties included merchandizing and assisting with inventory.[12] At the time of trial, Farahnaz worked part time at SJC entering inventory data.

V. *SJS*

On May 3, 2004, Joseph, Shahbaz, and Shahrokh formed SJS as a California limited liability company. Each of them owned (and, as of the time of trial, continued to own) a one-third interest in SJS. SJS has acquired several residential properties.

On or about April 8, 2005, Joseph, Shahbaz, and Shahrokh—not SJS—purchased a property at 1143 Colina Vista, Ventura, California (1143 Colina Vista), for $800,000. They acquired 1143 Colina Vista both for investment and so that Shahbaz could live closer to Mohtaram. On or about July 1, 2005, Joseph, Shahbaz, and Shahrokh transferred the title of 1143 Colina Vista to SJS.

Shahbaz and Anna listed 1143 Colina Vista as their home address on their income tax returns for 2012–14, and they also received mail at 1143 Colina Vista during 2012–14. SJS did not try to rent out 1143 Colina Vista to third parties during 2012–14. Petitioners have not produced any written agreement among SJS, Shahbaz, and Anna relating to Shahbaz and Anna's use of 1143 Colina Vista. On or about December 11, 2014, SJS transferred the title of 1143 Colina Vista to Joseph and Shahbaz.[13]

---

[12] This finding is based on a stipulated fact. Shahrokh and Farahnaz both testified contrary to the stipulation that although Farahnaz now works at SJC, Farahnaz did not work at SJC during 2012–14. Shahrokh testified that Farahnaz was "basically raising our kids" during those years. Nonetheless, the stipulation is not clearly erroneous in view of the entire record, so we will not disregard it. *Cf. Cal-Maine Foods, Inc.*, 93 T.C. at 195.

[13] The parties have provided contradictory stipulations on this point. They have stipulated both that SJS "transferred the title of 1143 Colina Visita [sic] to Joseph

**[\*12]** VI. *Barukh*

On September 20, 2007, Joseph, Shahbaz, and Shahrokh formed Barukh. They used Barukh to acquire commercial properties. Each of them owned (and, as of the time of trial, continued to own) a one-third interest in Barukh.

VII. *Personal Bank Accounts*

During 2011–15 petitioners held accounts at various financial institutions, either separately or in combination with each other. As explained below, Jamshid—without his knowledge or consent—was also named as an accountholder on some of the accounts. The parties have produced exhaustive banking records for these accounts. We will provide an overview of the accounts that are most important for our purposes.

Joseph and Shahbaz opened a Rabobank joint checking account with an account number ending in 2472 (Rabobank 2472) in December 2011. Rabobank 2472 received numerous deposits of certain of JFJ's and SJC's customer checks that Joseph and Shahbaz did not deposit into JFJ's and SJC's business bank accounts. In other words, Joseph and Shahbaz diverted numerous customer checks to Rabobank 2472 in lieu of depositing them into Rabobank 2418, Rabobank 1381, or Rabobank 4263 (as applicable). Joseph and Shahbaz did not provide information about Rabobank 2472 to Mr. Mehrnia in order to prepare their tax returns.[14]

Joseph and Shahbaz invested some of the funds in Rabobank 2472 into SJS, which in turn invested in residential real estate. Shahrokh was aware that proceeds from jewelry sales were used to purchase property. Joseph and Shahbaz also transferred some of the funds in Rabobank 2472 to JFJ's and SJC's business bank accounts, sometimes by depositing checks written from Rabobank 2472 that referred to Jamshid or a loan into those accounts. In addition, they used some of

---

and Shahbaz" and that SJS transferred 1143 Colina Vista's title "to a 1/3 tenant in common relationship in the name of each brother individually." We disregard the latter stipulation because the documentary evidence in the record reflects that SJS transferred 1143 Colina Vista's title to Joseph and Shahbaz, not to Joseph, Shahbaz, and Shahrokh. *See Cal-Maine Foods, Inc.*, 93 T.C. at 195.

[14] We need not and do not make any finding about whether Mr. Mehrnia was otherwise aware of Rabobank 2472 although we note that a $6,000 check written to him from that account and dated June 29, 2012, was paid.

[*13] the funds for personal purposes.  They used Rabobank 2472 through April 2014, when activity in the account stopped.

Through at least December 2014 a checking account ending in 8226 in Jamshid's name and over which Joseph, Shahbaz, and Shahrokh each held a power of attorney was maintained at Santa Barbara Bank & Trust (SBBT 8226).  SBBT 8226 was opened in August 2002.  Lilly disclosed assets in SBBT 8226 to a bank in connection with a loan application in 2004.  During 2012–14 SBBT 8226 received deposits of several five- and six-figure checks written to Jamshid from Rabobank 2472 or from third parties.  At least one check whose memo line references a loan to SJC was written from SBBT 8226 and deposited in Rabobank 4263, SJC's business bank account.[15]  On June 18, 2013, an outgoing wire for $988,924 was made from SBBT 8226 to an escrow company.  This occurred around the same time that SJS purchased a residential property for $1.04 million.

Joseph opened a JPMorgan Chase Bank checking account with an account number ending in 8913 (Chase 8913) in his and Jamshid's names in November 2010.  This account remained open through at least May 2014.

Shahbaz and Anna maintained a Bank of America joint checking account with an account number ending in 7088 (BofA 7088) during 2012–14.[16]  Anna also maintained a Bank of America checking account with an account number ending in 5186 (BofA 5186) during 2012–14.

VIII. *Jamshid*

Jamshid[17] has been retired since 2005 and receives a pension.  His last job before retiring was working at a "factory that produced safety items like security doors, security locks, [and] lock cylinders."  Jamshid has never resided in the United States, although he has visited the United States two or three times.  Jamshid has also never opened any bank accounts in the United States except for "a small account for

---

[15] The check was for $70,000 and dated July 8, 2014.  Jamshid's name is printed on the check.

[16] This finding is based on a stipulated fact.  Some of the account documents for BofA 7088 are addressed to Shahbaz and Joseph, not Shahbaz and Anna.  Nonetheless, because the stipulation is not clearly erroneous, we will not disturb it.  *See Cal-Maine Foods, Inc.*, 93 T.C. at 195.

[17] Although Jamshid's deposition testimony is in evidence, he is neither a party to these cases nor a trial witness.

**[\*14]** my daughter . . . [that] I closed . . . later because I needed the money," nor did he bring anything of value with him on his trips to the United States. He has never lent money to Joseph's, Shahbaz's, or Shahrokh's businesses or otherwise had any involvement with their businesses or properties. Jamshid did not receive any checks over $10,000 from Joseph, Shahbaz, or Shahrokh during 2012–14.

Although Jamshid was the named accountholder of SBBT 8226 and his name was printed on some checks written from it, he has no knowledge of the account and does not recognize any of the signatures on the signature card for it. Neither does he recognize (1) a $200,000 check written to him from Rabobank 2472 on January 15, 2012, (2) a $200,000 check written to him from Rabobank 2472 on May 8, 2013, (3) a $155,000 check written to him from Rabobank 2472 on March 21, 2014, or (4) a loan agreement dated November 18, 2009, purporting to memorialize a loan from him to SJC or his purported signature on that document. Shahbaz and Shahrokh signed the November 18, 2009, loan agreement on SJC's behalf.

IX.    *Tax Reporting and Examinations*

Petitioners all timely filed Forms 1040, U.S. Individual Income Tax Return, for 2012–14. Shahbaz and Anna also timely filed Forms 1040 for 2015 and 2016, as did Shahrokh and Farahnaz.[18] At all relevant times, JFJ, SJS, and Barukh were taxable as partnerships for federal income tax purposes, and SJC was taxable as an S corporation.[19] The income and losses from all four entities therefore passed through to their respective owners.

Petitioners' 2012–14 income tax returns were examined by Internal Revenue Service (IRS) Revenue Agent Laura Hurtado (RA Hurtado). During the examination, Mr. Mehrnia represented petitioners and their business entities.

---

[18] Joseph and Lilly's 2015 and 2016 taxable years are not at issue in these cases, and we make no finding of fact about them.

[19] An S corporation is governed under the rules in subchapter S of chapter 1 of subtitle A of the Code. S corporations are not generally themselves subject to federal income tax but, like partnerships, are conduits, through which income flows to their shareholders. *See* § 1366; *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001) ("Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation."); *see also Allen Fam. Foods, Inc. v. Commissioner*, T.C. Memo. 2000-327, slip op. at 5 & n.3.

[*15] RA Hurtado summoned records from financial institutions during the examination. Importantly, RA Hurtado noticed that a large number of business-related deposits had been made into Rabobank 2472, an account in Joseph's and Shahbaz's names. Some of the deposited checks had memo lines that referenced items other than jewelry, such as watches or wine glasses, or services that do not constitute sales of jewelry, such as watch repair, ring repair, or ring sizing. RA Hurtado also located specific items of income in SBBT 8226, Chase 8913, BofA 7088, and BofA 5186. There were relatively few check and cash deposits in JFJ's and SJC's alleged sole operating accounts, and the check and cash deposits that occurred were for relatively small amounts. SJC's sales journals identified substantial check and cash sales that do not correspond to the check and cash deposits in its operating account.

Joseph and Shahbaz each falsely represented to RA Hurtado during the examination that JFJ or SJC, respectively, had only one operating account for its business. In addition, Joseph falsely stated that a loan carried on JFJ's books was administered by Jamshid and represented an advance on an inheritance. Similarly, Shahbaz falsely stated that a loan carried on SJC's books represented an advance on his future inheritance from his father's estate. During the examination RA Hurtado made repeated written requests for information about sources of nontaxable income, such as gifts or inheritances. Joseph, Shahbaz, and Mr. Mehrnia, however, never mentioned sales of gift jewelry at all— much less suggested it as a nontaxable source of income—during RA Hurtado's examination. When RA Hurtado confronted Shahbaz about Rabobank 2472 and asked him why the financial activity in Rabobank 2472 stopped in April 2014, Shahbaz, in RA Hurtado's words, "indicated that that's when they went straight."

During the examination RA Hurtado determined that JFJ understated its gross receipts by $1,053,316, $605,565, and $315,581 for its 2012–14 taxable years, respectively. RA Hurtado also determined that SJC understated its gross receipts by $896,407, $495,504, and $397,615 for the same years. RA Hurtado determined the adjustments to JFJ's and SJC's gross receipts using a combination of the bank deposits analysis and specific items methods. In addition, RA Hurtado made several other adjustments to petitioners' income, only a few of which are noncomputational and remain unresolved at this stage of the proceedings. Although petitioners allege that Mr. Mehrnia dropped off original business records to the IRS's Camarillo, California, office and

**[\*16]** that the IRS failed to return them, we find as fact that Mr. Mehrnia never dropped off original business records at that office.[20]

On May 23, 2017, RA Hurtado's group manager, Andrew Hernandez, approved the assertion of the section 6663 fraud penalty (and, in the alternative, the section 6662 accuracy-related penalty) against petitioners for their 2012–14 taxable years. On June 8, 2017, respondent issued revenue agent reports to petitioners summarizing the examination changes, including the initial determinations to assert penalties.

On August 17, 2017, respondent timely mailed Notices of Deficiency to petitioners for their 2012–14 taxable years via certified mail. On November 13, 2017, petitioners timely filed Petitions requesting redetermination of the deficiencies respondent determined. Respondent later asserted an increase to JFJ's income for 2013, as well as several decreases to JFJ's and SJC's income.[21]

Shahbaz and Anna's 2015 and 2016 income tax returns, as well as Shahrokh and Farahnaz's 2015 and 2016 income tax returns, were

---

[20] Mr. Mehrnia's testimony was vague regarding to whom he supposedly gave the records, what records he allegedly gave to the IRS, and when he purportedly furnished those records. His testimony was not corroborated by documentary evidence, such as a receipt, even though RA Hurtado credibly testified that it was her office's practice to provide one in similar circumstances. Mr. Mehrnia's testimony that he furnished original documents to the IRS on several occasions because did not have time to make copies was also implausible: A reasonable person in his position would not have given original business documents to an unidentified person even once—let alone several times—without obtaining a receipt or exploring other alternatives, such as asking for an extension, requesting a secure way to produce (or permit inspection of) the documents, or using a professional copying service. Finally, Mr. Mehrnia's testimony lacked credibility because of his familial relationship to petitioners. We instead credit RA Hurtado's testimony that she never received original documents from Mr. Mehrnia.

Somewhat relatedly, we do not credit Joseph's testimony that some of JFJ's invoices burned in a 2017 wildfire. Joseph was not a credible witness on the whole. In addition it is unclear from the record whether his testimony that some of JFJ's invoices burned in a 2017 wildfire is consistent with his testimony that he regularly provided JFJ's invoices to Mr. Mehrnia during 2012–14.

[21] Specifically, respondent asserted that (1) the adjustment to JFJ's gross receipts for 2012 should be reduced by $322,133 to $731,183, (2) the adjustment to JFJ's gross receipts for 2013 should be increased by $71,382 to $676,947, (3) the adjustment to JFJ's other income for 2013 should be reduced by $810 to $130,097, (4) the adjustment to JFJ's gross receipts for 2014 should be reduced by $255,773 to $55,809, and (5) the adjustment to SJC's gross receipts for 2013 should be reduced by $75,000 to $420,504.

[*17] examined by Revenue Agent Tam Mai (RA Mai). On August 16, 2018, RA Mai's group manager, June Liu, approved the assertion of section 6662 accuracy-related penalties against Shahbaz, Anna, Shahrokh, and Farahnaz for their 2015 and 2016 taxable years. On the same date, respondent issued revenue agent reports to Shahbaz, Anna, Shahrokh, and Farahnaz summarizing the examination changes and communicating the initial determinations to assert penalties. The adjustments RA Mai determined primarily concerned NOL carryforward deductions claimed by Shahbaz, Anna, Shahrokh, and Farahnaz, which are the only noncomputational adjustments for 2015 and 2016 requiring our decision.

On September 21, 2018, respondent timely mailed Notices of Deficiency to Shahbaz, Anna, Shahrokh, and Farahnaz for their 2015 and 2016 taxable years via certified mail. On December 19, 2018, Shahbaz, Anna, Shahrokh, and Farahnaz timely filed Petitions requesting redetermination of the deficiencies respondent determined against them for their 2015 and 2016 taxable years.

OPINION

I. *Gift Jewelry Story*

Petitioners, relying on some of their own and Jamshid's testimony and some of the documentary evidence, present us with a story about why they did not report a substantial portion of JFJ's and SJC's sales as income (gift jewelry story). We summarize the gift jewelry story in this part without making any finding that it has any truth.[22]

Jamshid testified in his deposition that Mohtaram purchased finished jewelry from Jewellery Studio in Tel Aviv, Israel, and the finished jewelry incorporated some of the gemstones Mohtaram had purchased in Iran. Jamshid also testified that he was present during some, but not all, of the occasions when Mohtaram visited Jewellery Studio. According to Jamshid, in late 1983 Mohtaram (with his assistance) boxed and shipped the gemstones, finished jewelry, and

---

[22] As discussed *infra* Part IV.A, there is very little in the record to corroborate the gift jewelry story. Consequently, we summarize the gift jewelry story only to explain why we conclude as we do in this Opinion. For the purposes of our analysis, we do not adopt these stories as findings of fact, and the elements of the story recited here should not be construed as findings of fact.

[*18] related receipts from Israel to Joseph in the United States because she intended to emigrate from Israel to the United States.

Joseph testified that he received the box sent from Mohtaram in December 1983 and returned it unopened to Mohtaram in 1987 after she immigrated to the United States. He further testified that Mohtaram gave the still-unopened box and its contents as gifts to him, Shahbaz, Shahrokh, and Jamshid in 2010, which was approximately 23 years after she immigrated to the United States and 8 years before she died. Joseph, Shahbaz, and Shahrokh each testified to being present when the box was opened, and Joseph and Shahrokh further testified that Mohtaram was present. Jamshid testified that Joseph told him about the gifts in 2010.

Joseph testified that the box was filled with jewelry, gemstones, precious stones, gold, platinum, legal documents, receipts from Israel, and Farsi-language (i.e., Persian) receipts, and Shahbaz corroborated that description. According to Joseph, there were about 1,600 to 1,700 items of jewelry in total. Joseph and Shahbaz testified that the items were dated and out of style. Joseph further testified that Mohtaram gave him and his brothers a handwritten letter (also referred to as a gift note) memorializing the gift of jewelry; the gift note also memorialized a separate gift of two houses to two of her other children.[23]

Shahbaz and Shahrokh testified that the gift jewelry was later modified to increase its marketability. Joseph and Shahbaz testified that sales of the gift jewelry began in 2011 and stopped sometime in 2014. Joseph testified that most of the gift jewelry was kept at SJC, while other items were kept in JFJ's safe.

Joseph and Shahbaz testified that the proceeds from the gift jewelry sales totaled approximately $3 million and were deposited into Rabobank 2472. According to them, the gift jewelry was segregated from JFJ's and SJC's regular merchandise via yellow tags affixed to the gift jewelry and white or silver tags affixed to regular merchandise. Joseph testified that cost figures on Exhibit 835-P (Jewellery Studio invoices),

---

[23] The alleged gift note is in evidence as Exhibit 833-P, and a certified translation is in evidence as Exhibit 834-P. The Second Supplemental First Stipulation of Facts identifies Exhibit 834-P as a translation of a nonexistent "Exhibit 831-P" (only Exhibit 831-J is in the record), and this identification is also erroneous because Exhibit 834-P is a translation of Exhibit 833-P, not Exhibit 831-J. We disregard the stipulation to the extent it is erroneous. *See Cal-Maine Foods, Inc.*, 93 T.C. at 195.

[*19] a set of invoices that we discuss later, were used to price each item of gift jewelry for sale and that "[w]e knew how much the cost was based upon the catalog number."

Joseph testified that Exhibit 839-P (logbook) was contemporaneously prepared to track sales of the gift jewelry, and Shahbaz corroborated that testimony. The logbook, which is a spiral notebook, contains handwritten entries including (1) notations briefly describing each item, (2) the date of sale, (3) the check number associated with the sale, (4) the sale amount, and (5) the item number (i.e., the catalog number from the Jewellery Studio invoices). Joseph asserted that the primary purpose of creating the logbook was to facilitate an equitable division of the proceeds from sales of the gift jewelry among himself, Shahbaz, Shahrokh, and Jamshid. Joseph and Shahbaz testified that credit card sales of the gift jewelry were not recorded in the logbook and that those sales were reported as sales of JFJ's and SJC's regular merchandise, with the result that taxes were imposed on that income. Joseph and Shahbaz testified that the logbook moved back and forth between SJC and JFJ, which are within walking distance of each other, although it typically remained at SJC.

Joseph testified that he instructed his employees to set aside the yellow tags from the gift jewelry items that had been sold, as well as any checks customers used to purchase those items, for subsequent recording in the logbook. He also testified that JFJ employees sometimes recorded sales of the gift jewelry on paper before those sales were entered into the logbook. According to Shahbaz, SJC's employees recorded sales of gift jewelry in the logbook, including yellow tags or notes that came from JFJ across the street; furthermore, at SJC, the yellow tags were discarded after an item of gift jewelry was sold. Joseph and Shahbaz asserted that they did not inform Mr. Mehrnia about the gift jewelry because he was married to their sister, and their sister might have taken offense at not being included in Mohtaram's gift of the jewelry.

Shahbaz testified that he showed the gift jewelry to an IRS agent (not RA Hurtado or RA Mai) who toured SJC. Joseph testified that because the gift jewelry was dated and out of style, he and his brothers sold it with the objective of recouping as much of its original cost as possible instead of attempting to make a profit over and above its original cost. Joseph and Shahbaz testified that the proceeds from the gift jewelry sales were deposited into Rabobank 2472, not into JFJ's and SJC's business bank accounts. In addition they testified that after they

**[*20]** deposited the proceeds in Rabobank 2472, they invested most of the proceeds in residential real estate, including through SJS. Finally, they testified that they paid Jamshid $90,000 in mid-2014 in respect of his share of the gift jewelry proceeds.

## II. *Evidentiary Matters*

As a preliminary matter, we must address the admissibility of certain documentary evidence introduced at trial but for which we reserved ruling. Our evidentiary rulings are determined under the Federal Rules of Evidence. *See* § 7453; Rule 143(a). Statements in briefs and unadmitted allegations in pleadings do not constitute evidence. *See* Rule 143(c).

Irrelevant evidence is not admissible. *See* Fed. R. Evid. 402. An item of evidence is relevant to the extent it tends to make a fact more or less probable and the fact is consequential to determining the action. *See* Fed. R. Evid. 401. When the relevance of evidence depends on a fact, proof must be introduced sufficient to support a finding that the fact does exist. *See* Fed. R. Evid. 104(b). The "requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)." Fed. R. Evid. 901(a) advisory committee's note to 1972 proposed rules. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

Hearsay is not admissible unless any of the following provides otherwise: a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 802. Hearsay means a statement that (1) the declarant does not make while testifying at the current trial or hearing and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c).

At trial we admitted Exhibit 835-P, the Jewellery Studio invoices, for a limited purpose, *cf.* Fed. R. Evid. 105, but reserved ruling on whether the Jewellery Studio invoices may be used to prove the truth of their contents. In addition, we reserved ruling on the admissibility of Exhibit 836-P (Iranian invoices), as well as Exhibit 839-P, the logbook. Petitioners have conceded that they are offering the Iranian invoices and the logbook only for limited purposes. We will (1) admit the Jewellery Studio invoices (Exhibit 835-P) without any limitation,

**[\*21]** (2) exclude the first three pages of the Iranian invoices (Exhibit 836-P) and admit the remainder for a limited purpose, and (3) admit the logbook (Exhibit 839-P) for a limited purpose.

### A.    *Exhibit 835-P: Jewellery Studio Invoices*

The Second Supplemental First Stipulation of Facts identifies Exhibit 835-P, the Jewellery Studio invoices, as "seventeen invoices for jewelry purchases in 1983 from Jewellery Studios [sic] in Israel."[24] The contents of the Jewellery Studio invoices include, inter alia, handwritten notations of catalog numbers, quantity figures, "Total Price" figures, and jewelry terms, as well as handwritten notations referring to Mohtaram. They do not specify on their face whether they record purchases of jewelry from Jewellery Studio or sales of jewelry to Jewellery Studio.

The Second Supplemental First Stipulation of Facts states in part that

> all exhibits referred to herein and attached hereto may be accepted as authentic and are incorporated in this stipulation and made a part hereof; provided, however, that either party has the right to object to the admission of any such facts and exhibits in evidence on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein.

Respondent reserved only a hearsay objection to Exhibit 835-P. On its face this constitutes respondent's waiver of any authentication objection to Exhibit 835-P. At trial we admitted Exhibit 835-P for a limited purpose but reserved ruling on whether it may be used to prove the truth of its contents.

Respondent now purports to object to Exhibit 835-P on authentication grounds in addition to his reserved hearsay objection. Nonetheless, Rule 91(e) prevents a party from qualifying, changing, or contradicting a stipulation, except as we may permit if justice requires. The record as a whole does not support a conclusion that justice requires us to permit respondent to vary from the stipulation. For example, while respondent notes that Jamshid "did not identify which exact documents

---

[24] The stipulation's reference to "Jewellery Studios" instead of Jewellery Studio is a scrivener's error. The reference to 17 invoices instead of 18 invoices is also a scrivener's error. We disregard the erroneous portions of the stipulation. *See Cal-Maine Foods, Inc.*, 93 T.C. at 195.

**[\*22]** in Exhibit 835-P corresponded to [the] times he was present" at Jewellery Studio, respondent and petitioners filed the Second Supplemental First Stipulation of Facts over a month after Jamshid's deposition occurred. Respondent thus presumably considered—and, in any case, could have considered—the content of Jamshid's deposition testimony when he decided which objections to reserve. Neither does respondent argue that the Jewellery Studio invoices record sales of jewelry by Mohtaram to Jewellery Studio instead of purchases by her from Jewellery Studio.[25] We will hold respondent to the terms of the binding stipulation to which he agreed.

We consider respondent's hearsay objection, but it is easily overruled. Rule 803(16) of the Federal Rules of Evidence provides that a statement in a document that was prepared before January 1, 1998, and whose authenticity is established, is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness. The authentication requirement of Rule 803(16) of the Federal Rules of Evidence "is governed by the standards set forth in" Rule 901(a) of the Federal Rules of Evidence. *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 464 (5th Cir. 1985); *see Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 360–62 (2016). Therefore, whether a hearsay exception under Rule 803(16) of the Federal Rules of Evidence is available for a document prepared before January 1, 1998, is derivative of whether the document can be properly authenticated. Here, the Jewellery Studio invoices were prepared in 1983, and the parties authenticated them by agreement in the Second Supplemental First Stipulation of Facts. Therefore, an exception to the rule against hearsay applies, and we admit Exhibit 835-P into evidence without any limitation on its use.

B. *Exhibit 836-P: Iranian Invoices*

Petitioners allege that Exhibit 836-P comprises three invoices for gemstones purchased in 1978 and 1979 in Iran. Petitioners stated at trial that they are offering the Iranian invoices to show that Mohtaram acquired items in Iran that she took to Israel, but "not as to the cost or the specifics of the invoices themselves." Respondent reserved objections for authentication, hearsay, and lack of foundation in the Second Supplemental First Stipulation of Facts but abandoned the lack of foundation objection at trial. We will hold petitioners to their

---

[25] Although Jamshid initially testified that Mohtaram did not sell any jewels to Jewellery Studio, Jamshid later submitted an errata sheet with a correction stating that "[s]he traded some."

**[\*23]** concession on the limited purpose for which each Iranian invoice may be used, even if admitted into evidence. *Cf.* Fed. R. Evid. 105. We will consider each Iranian invoice individually in determining whether it may be admitted for this limited purpose. We sustain in part and overrule in part respondent's objections, and we admit Exhibit 836-P for the limited purpose identified by petitioners except for the portion as to which we sustain respondent's objections.

We begin with respondent's authentication objection. Rule 901(a) of the Federal Rules of Evidence provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "The terms of the Rule are thus satisfied, and the proffered evidence should ordinarily be admitted, once a prima facie case has been made on the issue. . . . At that point the matter is committed to the trier of fact to determine the evidence's credibility and probative force." *United States v. Johnson*, 637 F.2d 1224, 1247 (9th Cir. 1980).

A document may be authenticated by the testimony of a witness with knowledge that the item is what it is claimed to be. *See* Fed. R. Evid. 901(b)(1). A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. A document may also be authenticated through "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Documentary evidence generally should not be excluded "on the sole ground that [it] must be authenticated by a competent witness with personal knowledge of [its] authenticity" if the evidence "could have been authenticated by review of [its] contents if [it] appeared to be sufficiently genuine." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011).

The Iranian invoices comprise (1) an invoice from Jannati Jewelry dated May 27, 1979 (Jannati document), (2) an invoice referencing Firoozeh Gold dated November 1, 1978 (Firoozeh Gold document), and (3) an invoice from Moozeh Zar Jewelry dated May 3, 1978 (Moozeh Zar document). We will address the Firoozeh Gold and Moozeh Zar documents first. Jamshid testified that he recognized the Firoozeh Gold and Moozeh Zar documents as "the papers that my mother had received for the purchase of the jewelry in Iran." Jamshid's deposition testimony could support a potential finding that he had adequate personal knowledge to make that statement. There are no obvious alterations to

**[\*24]** these two documents, and the face of the documents (as translated) could support the identification petitioners advanced. *Cf.* Fed. R. Evid. 901(b)(4). The Firoozeh Gold and Moozeh Zar documents make clear that they record purchases of gemstones or jewelry by Mohtaram in Iran in 1978. Petitioners have therefore authenticated the Firoozeh Gold and Moozeh Zar documents, although we must still address respondent's hearsay objection to them.

As we stated at trial, although petitioners have offered the Iranian invoices for a limited purpose, petitioners have still offered them for a hearsay purpose (i.e., to show the truth of their assertions that Mohtaram purchased gemstones in Iran in 1978 and 1979). Therefore, the Firoozeh Gold and Moozeh Zar documents are excludable as hearsay unless an exception to the rule against hearsay applies. On brief petitioners rely only on Rule 803(16) of the Federal Rules of Evidence. As explained above, whether a hearsay exception is available under Rule 803(16) of the Federal Rules of Evidence for a document prepared before January 1, 1998, is derivative of whether the document can be properly authenticated. Furthermore, while Rule 803(16) of the Federal Rules of Evidence provides an exception to the rule against hearsay for statements in ancient documents, it does not require the proponent to authenticate the document pursuant to Rule 901(b)(8) of the Federal Rules of Evidence, which merely provides an illustrative example concerning the authentication of ancient documents. Instead, the only requirement is that Rule 901(a) (or Rule 902) of the Federal Rules of Evidence be satisfied. *See* Fed. R. Evid. 803(16) advisory committee's note to 2017 amendment ("The limitation of the ancient documents hearsay exception [to documents prepared before January 1, 1998,] is not intended to have any effect on authentication of ancient documents. The possibility of authenticating an old document under Rule 901(b)(8)—or under any ground available for any other document— remains unchanged."). Because petitioners have authenticated the Firoozeh Gold and Moozeh Zar documents, including the claim that they were prepared before January 1, 1998, we overrule respondent's objections to them and admit them for the limited purpose petitioners identified at trial.

Jamshid also testified, however, that he had never seen the Jannati document. Despite being unable to rely on Jamshid's testimony to authenticate the Jannati document, petitioners invoke Rule 901(b)(8) of the Federal Rules of Evidence, which is an illustrative example of evidence satisfying the authentication requirement for an ancient document. The rule provides that, for a document or data compilation,

**[\*25]** evidence satisfying the requirement of authenticating or identifying an item of evidence includes evidence that it (1) is in a condition that creates no suspicion about its authenticity; (2) was in a place where, if authentic, it would likely be; and (3) is at least 20 years old when offered.

As an initial matter, the Jannati document—a purported receipt for a 1979 sale transaction in Iran whose letterhead bears a World Wide Web address on it—is at least arguably in a condition that creates suspicion about its authenticity.[26] While the parties have strenuously argued this matter,[27] we need not reach this dispute[28] for another reason: Petitioners have not introduced any evidence about where they found the Jannati document. While Joseph testified that there were "Persian receipts" in the alleged gift box, he also testified that although he "can't remember," he thought there were only "two . . . receipts from Iran" in the box. Joseph did not testify about which of the Iranian invoices in Exhibit 836-P, if any, corresponded to the receipts he saw in the box. Likewise, Shahbaz testified vaguely that there were a "bunch of other invoices from Iran" in the box, but he did not testify about Exhibit 836-P at all, let alone the Jannati document. Petitioners thus have not introduced evidence showing where the Jannati document was found and have not authenticated the Jannati document pursuant to Federal Rule of Evidence 901(b)(8).

Even if petitioners had argued that Federal Rule of Evidence 901(b)(4) applies—or, alternatively, even assuming we needed to consider pursuant to Federal Rule of Evidence 901(b)(8)(A) whether the Jannati document "is in a condition that creates no suspicion about its authenticity"—petitioners still could not authenticate the Jannati

---

[26] At trial we requested petitioners to provide us with the original hard-copy versions of certain exhibits, including Exhibit 836-P. After trial, we received and reviewed the hard-copy versions of those exhibits. The World Wide Web address is somewhat difficult to read on the version of the Jannati document on the electronic case record, but it is clear on the hard-copy Jannati document.

[27] Although it is clear the World Wide Web "was not developed until 1989," *Kubota Corp. v. Shredderhotline.com Co.*, No. 12 C 6065, 2013 WL 6096999, at \*4 n.1 (N.D. Ill. Nov. 20, 2013), it is unclear whether, for example, someone may have properly obtained the Jannati document by contacting the merchant at a later date. We note, however, that if the Jannati document was generated later, it would need to have been generated before January 1, 1998, for Federal Rule of Evidence 803(16) to provide a hearsay exception.

[28] We also avoid another potential issue with petitioners' position. Jamshid testified that Mohtaram left Iran in 1978, not 1979, but we have disregarded that testimony as inconsistent with one of the parties' stipulations. *See supra* note 10.

**[\*26]** document. This is because a review of its contents reveals the suspect appearance of a World Wide Web address on it. We have also viewed the original hard-copy Jannati document, *see supra* note 26, and the incongruity between the inclusion of the World Wide Web address and the seemingly aged paper is more readily appreciable by viewing the original, *cf. McGuire v. Blount*, 199 U.S. 142, 145 (1905) (stating that the "production of the originals . . . has given the court an opportunity to inspect" certain ancient documents and analyzing whether "[t]hey bear upon their face every evidence of age and authenticity" or, to the contrary, there is anything "about them to suggest that they have been forged or tampered with"). There may be an explanation for the Jannati document's unusual appearance, but testimony addressing it would be necessary for us to consider admitting it. Because petitioners have not authenticated the Jannati document, we sustain respondent's authentication and hearsay objections to it, and we exclude it from evidence.[29]

### C. *Exhibit 839-P: Logbook*

Petitioners allege that the logbook, Exhibit 839-P, is a "photocopy of an alleged original ledger of sales of the gifted jewelry." Petitioners conceded in their Simultaneous Opening Brief that they "seek to admit the Logbook not for the truth of its content, but rather to show Petitioners' intent in creating the Logbook itself." Respondent reserved hearsay, authentication, lack of foundation, and best evidence rule objections in the Second Supplemental First Stipulation of Facts but conceded the best evidence rule objection at trial. We will hold petitioners to their concession on the limited purpose for which the logbook is being offered. *Cf.* Fed. R. Evid. 105. We overrule respondent's objections in view of that concession and admit the logbook for the limited purpose petitioners identified.

Showing petitioners' alleged intent is a nonhearsay purpose for offering the logbook, so we overrule respondent's hearsay objection. We also overrule respondent's foundation and authentication objections in view of the limited purpose for which petitioners are offering the logbook. Joseph and Shahbaz testified about how petitioners allegedly instructed their employees to create the logbook, how it was allegedly maintained, and how it was purportedly intended to be a sales record

---

[29] We note that, in any case, we have made the factual finding for which petitioners intended the Jannati document to provide additional support (i.e., that Mohtaram purchased gemstones in Iran before emigrating to Israel).

**[\*27]** for items they intentionally segregated from their regular merchandise. To be clear, this testimony was arguably vague, as well as barely sufficient to authenticate the logbook and lay a foundation for connecting it to petitioners' alleged intent. For example, no witness identified the handwriting or named the person who wrote in the logbook. Nonetheless, under the circumstances here, those considerations concern the weight we should accord the logbook and not its admissibility. Accordingly, we admit the logbook into evidence for the limited purpose petitioners identified.

III.    *Evaluation of Evidence*

"The most important and most crucial action the courts take in [a trial] is to resolve facts." *United States v. Gainey*, 380 U.S. 63, 88 (1965) (Black, J., dissenting); *see Diaz v. Commissioner*, 58 T.C. 560, 564 (1972) ("[T]he distillation of truth from falsehood . . . is the daily grist of judicial life."). The fact-finding process often requires the Court as the finder of fact to evaluate the credibility of witness testimony before making findings on the basis of that testimony. We have stated that in determining credibility,

> [w]e observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and assign it weight for the primary purpose of finding disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on his or her behalf does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor. We will not accept the testimony of witnesses at face value if we find that the outward appearance of the facts in their totality conveys an impression contrary to the spoken word.

*Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). As the trier of fact we may credit evidence in full, in part, or not at all. We may credit the part of a witness's testimony that is not self-serving, while requiring some form of corroboration before crediting the portion that is. *See Factor v. Commissioner*, 281 F.2d 100, 114 n.27 (9th Cir. 1960) ("The Tax Court may accept parts and reject other parts of a witness's testimony."), *aff'g* T.C. Memo. 1958-94; *Baumgardner v. Commissioner*, 251 F.2d 311,

[*28] 321 (9th Cir. 1957) ("The Tax Court was willing to accept in part the taxpayer's claim of alleged profits from buying and selling improvement bonds. It was not required to accept it in full."), *aff'g* T.C. Memo. 1956-112.

It is "the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996); *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) (stating that if the trial court's view of the evidence is plausible in the light of the record, a reviewing court may not disturb it absent clear error, even when the trial court's findings "do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts"); *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949) (stating that where there are two permissible views of the evidence, the factfinder's choice between them is not clearly erroneous); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (stating that a finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed"); *Estate of Rau v. Commissioner*, 301 F.2d 51, 54 (9th Cir. 1962) ("The Tax Court personally observed the witnesses . . . and from that vantage point was in a position to evaluate their testimony in the light of their attitude and demeanor while being interrogated."), *aff'g* T.C. Memo. 1959-117. We may reject "vague and implausible testimony" in a case involving unreported income. *Delaney v. Commissioner*, 743 F.2d 670, 672 (9th Cir. 1984), *aff'g* T.C. Memo. 1982-666. We determine the credibility of witnesses, resolve evidentiary conflicts, and draw inferences from the record with this framework in mind.

IV. *Analysis*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. *See* Rule 142(a)(1); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Rockwell v. Commissioner*, 512 F.2d 882, 885–87 (9th Cir. 1975), *aff'g* T.C. Memo. 1972-133. Nonetheless, if the Commissioner raises a new matter, seeks an increase in deficiency, or asserts an affirmative defense, the Commissioner bears the burden of proof as to the new matter, increased deficiency, or affirmative defense. *See* Rule 142(a). After respondent issued the Notice of Deficiency to Joseph and Lilly for their 2012–14 taxable years, respondent asserted that JFJ's gross receipts for 2013

**[\*29]** should be increased by \$71,382.  Accordingly, respondent bears the burden of proof with respect to the increased income tax deficiency attributable to this adjustment.

Petitioners have not argued or shown that the burden of proof should shift to respondent under section 7491(a), and we conclude that section 7491(a) does not apply under the circumstances here. Petitioners thus bear the burden of proof with respect to the other nonpenalty determinations at issue in these cases, although respondent bears the burden of production with respect to unreported income, as discussed below.  We discuss the burden of proof applicable to the penalties respondent determined against petitioners separately in connection with our discussion of those penalties.

A.      *Unreported Income*

Section 61(a) defines gross income as "all income from whatever source derived," including income derived from business.  Exclusions from gross income are narrowly construed.  *See Commissioner v. Schleier*, 515 U.S. 323, 328 (1995); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–30 (1955); *Helvering v. Clifford*, 309 U.S. 331, 334 (1940).  A taxpayer must maintain books and records establishing the amount of his or her gross income.  *See* § 6001; Treas. Reg. § 1.6001-1(a). If the taxpayer fails to do so, the Commissioner may reconstruct income through any reasonable method that clearly reflects income. *See* § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989).  The reconstruction need only be reasonable in view of the surrounding facts and circumstances.  *See Petzoldt*, 92 T.C. at 687; *see also Union Stock Farms v. Commissioner*, 265 F.2d 712, 721 (9th Cir. 1959).

In cases of unreported income, "the Commissioner must establish a 'minimal evidentiary showing' connecting the taxpayer with the alleged income-producing activity," *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019) (quoting *Blohm v. Commissioner*, 994 F.2d 1542, 1549 (11th Cir. 1993), *aff'g* T.C. Memo. 1991-636); *see also Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), "or demonstrate that the taxpayer actually received unreported income," *Walquist*, 152 T.C. at 67 (citing *Edwards v. Commissioner*, 680 F.2d 1268, 1270 (9th Cir. 1982)).  The requisite evidentiary foundation is "minimal."  *Banister v. Commissioner*, T.C. Memo. 2008-201, 96 T.C.M. (CCH) 114, 114, *aff'd*, 418 F. App'x 637 (9th Cir. 2011).  "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that

**[\*30]** the Commissioner's determinations are arbitrary or erroneous." *Walquist*, 152 T.C. at 67–68 (first citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935); and then citing *Tokarski v. Commissioner*, 87 T.C. 74 (1986)); *see Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97.

The Commissioner "may choose to proceed under any single theory of proof or a combination method, including a combination of circumstantial and direct proofs." *United States v. Abodeely*, 801 F.2d 1020, 1023 (8th Cir. 1986); *see Dyer v. Commissioner*, T.C. Memo. 2012-224, at \*15–20; *Price v. Commissioner*, T.C. Memo. 2004-103, slip op. at 24–25. "Although the absence of adequate tax records does not give [the Commissioner] carte blanche for imposing Draconian absolutes, such absence does weaken any critique of [the Commissioner's] methodology." *Petzoldt*, 92 T.C. at 693 (citing *Webb v. Commissioner*, 394 F.2d 366, 373 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81).

The bank deposits method is an accepted indirect method for reconstructing income. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994); *DiLeo v. Commissioner*, 96 T.C. 858, 867 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *Estate of Mason v. Commissioner*, 64 T.C. 651, 656 (1975), *aff'd*, 566 F.2d 2 (6th Cir. 1977). The bank deposits method assumes that all deposits are taxable, but the Commissioner must account for any nontaxable source or deductible expense of which he has knowledge. *See Clayton*, 102 T.C. at 645–46; *DiLeo*, 96 T.C. at 868. Nontaxable sources include funds attributable to interaccount bank transfers and returned checks, as well as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period. *See Showalter v. Commissioner*, T.C. Memo. 2022-114, at \*5–6. The taxpayer bears the burden of proving a nontaxable source for deposits. *See DiLeo*, 96 T.C. at 869; *Barnes v. Commissioner*, T.C. Memo. 2016-212, at \*32, *aff'd*, 773 F. App'x 205 (5th Cir. 2019); *see also Tokarski*, 87 T.C. at 77 ("A bank deposit is prima facie evidence of income and [the Commissioner] need not prove a likely source of that income.").

The specific items method is a direct proof of income reconstruction this Court has approved. *See Dyer*, T.C. Memo. 2012-224, at \*17. Once the Commissioner produces clear evidence of unreported gross income, the taxpayer bears the burden of proving that the Commissioner's method of income reconstruction is unfair or inaccurate under the specific items method. *See Flynn v. Commissioner*, T.C. Memo. 2021-43, at \*24. To carry this burden, the taxpayer generally

**[\*31]** must offer "competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice," *Dyer*, T.C. Memo. 2012-224, at \*18 (quoting *Sharwell v. Commissioner*, 419 F.2d 1057, 1060 (6th Cir. 1969), *vacating and remanding* T.C. Memo. 1968-89), or otherwise "prov[e] a nontaxable source of the unreported income," *Levine v. Commissioner*, T.C. Memo. 1998-383, 1998 WL 738061, at \*6, *aff'd*, 229 F.3d 1158 (9th Cir. 2000) (unpublished table decision).

The income-producing activities as to which respondent has determined unreported income, and which remain in dispute, are the jewelry businesses conducted by JFJ and SJC. The record, which includes petitioners' own testimony and relevant stipulations, clearly establishes the connections between (1) Joseph, Lilly, and the jewelry business conducted by JFJ, as well as (2) Shahbaz, Shahrokh, and the jewelry business conducted by SJC.[30] The record also contains extensive bank records and copies of canceled checks, along with summary schedules, showing that petitioners received payments that they did not report as income. Furthermore, as already discussed, Joseph and Shahbaz admitted that they chose not to inform Mr. Mehrnia, their tax return preparer, about deposits into Rabobank 2472. Respondent has thus met his burden of production, and his determinations of unreported income are generally entitled to a presumption of correctness. Nonetheless, the burden of proof will remain with respondent with respect to the increased income tax deficiency attributable to respondent's assertion that JFJ's 2013 gross receipts should be increased by $71,382, which we discuss separately.

While petitioners have argued that some of the income respondent determined is attributable to a nontaxable source, which we address below, petitioners have not shown that respondent's reconstruction of their income was otherwise arbitrary or erroneous. *Cf. Showalter*, T.C. Memo. 2022-114, at \*6 (noting that the "only flaw that [the taxpayer] discerned in [the Commissioner's] bank deposits analysis was the alleged failure to exclude nontaxable . . . proceeds" and that the taxpayer "alleged no other error in [the Commissioner's] bank deposits analysis"); *Flynn*, T.C. Memo. 2021-43, at \*25 (noting that while the taxpayer argued that "funds deposited into his bank accounts . . . were

---

[30] Respondent attributed deposits of JFJ's items to Joseph and Lilly, and deposits of SJC's items to Shahbaz and Shahrokh, with one qualification: Joseph and Shahbaz jointly owned Rabobank 2472, so respondent attributed checks deposited in that account and written to unknown or blank payees, to "Sehati," to "Cash," or to other ambiguous payees half to JFJ and half to SJC.

[*32] investments," the taxpayer "provided no credible evidence demonstrating error in [the Commissioner's] analysis, and he does not dispute the amount of funds received for any of the years in issue"). Respondent reasonably reconstructed petitioners' income for 2012–14. Petitioners failed to keep or provide adequate books and records from which their tax liabilities could be computed, and Joseph and Shahbaz each falsely represented to respondent that JFJ or SJC, respectively, had only one business bank account. Respondent collected financial information through third-party summonses and reconstructed petitioners' income using a combination of the bank deposits and specific items methods. Respondent adjusted petitioners' income for known nontaxable items and reported income, and respondent allowed additional adjustments after petitioners brought cases in this Court. Respondent also cautiously—and generously—excluded cash sales that were recorded on JFJ's sales log but unmatched by a corresponding bank deposit from his calculation of JFJ's income. While respondent generally does not bear the burden of proof on nonpenalty issues, respondent nonetheless demonstrated at trial that petitioners underpaid their tax and underreported their income for 2012–14 because many of the deposits into their personal bank accounts came from taxable sources, such as checks with descriptions in their memo lines like "To repair Rolex Watch" or "Rolex adjustment."[31] Respondent has clearly and convincingly shown that petitioners underreported their income and, consequently, underpaid their income tax[32] for 2012–14.

Respondent has also met his burden of proof on the increase in deficiency for Joseph and Lilly's 2013 taxable year that is attributable to a $71,382 adjustment to JFJ's 2013 gross receipts. The adjustment is calculated by subtracting $30,001 of adjustments in Joseph and Lilly's favor from a $101,383 upward adjustment to JFJ's 2013 gross receipts that respondent asserted after these cases were docketed. RA Hurtado credibly testified that the $101,383 adjustment represented "the amount of deposits for the month of January in 2013 [into Rabobank 1381 that] was not in the analysis. So it's a correction that's being made." The account statements for Rabobank 1381 are in the record, and we have verified that JFJ's deposits into Rabobank 1381 for January 2013 have

---

[31] Respondent has compiled a more comprehensive list of items of this sort with citations of the record in his Simultaneous Reply Brief.

[32] We reject petitioners' computational arguments about the effect that disallowing their claimed NOL deductions has on their income tax deficiencies *infra* Part IV.C. *See infra* note 40 and accompanying text.

**[\*33]** not been double counted after the increase in deficiency respondent asserted.

Petitioners offer the gift jewelry story to explain why much of the unreported income respondent has identified allegedly derives from a nontaxable source of income. As an initial matter, petitioners' reliance on the gift jewelry story is misplaced because gain from the sale of gift property (including any gain attributable to the holding period of a donor or a succession of donors) is a taxable source of income, not a nontaxable source. *See* §§ 61(a)(3), 1001(a), 1015; *Cooper v. United States*, 280 U.S. 409 (1930); *Wilson Bros. & Co. v. Commissioner*, 124 F.2d 606, 610 (9th Cir. 1941); *Shatzer v. Commissioner*, 3 T.C. 914, 916 (1944); *cf.* § 102(a) (excluding gifts from gross income but not mentioning sales of gift property).

It is true, of course, that a sale of property for an amount realized that is less than or equal to the property's adjusted basis will not cause a taxpayer to realize gain. *See* Treas. Reg. § 1.1001-1(a). Nonetheless, petitioners have not done the work of tracing each item of income respondent identified to a specific piece of alleged gift jewelry and an alleged adjusted basis for each piece, let alone presenting this information in a usable format or calculating the resulting gain or loss on each piece. Likewise, they have not traced the entries on the Jewellery Studio invoices to specific customer transactions or sales invoices at JFJ or SJC. "We need not (and shall not) undertake the task of sorting through the voluminous evidence . . . provided in an attempt to see what is, and what is not, adequate substantiation of the" adjusted basis for each piece. *Hale v. Commissioner*, T.C. Memo. 2010-229, slip op. at 6. We also accord no weight to Joseph's and Shahbaz's self-serving testimony that they sold the alleged gift jewelry at a price equal to or below the original cost for which Mohtaram bought it (together with adjustments for modifications) because those statements are not an adequate substitute for documentary evidence under the circumstances here. *Cf.* Treas. Reg. § 1.6001-1(a), (e).

The tracing problem is especially acute in these cases because the logbook is in evidence only for the purpose of showing petitioners' intent, not for the truth of its contents, and there are no sales invoices in the record. In other words petitioners have not laid an adequate foundation to connect any item of income respondent identified to any item of alleged gift jewelry, even if we made the effort ourselves. Petitioners have thus admitted that the items of income respondent identified derive from a source of income that is generally taxable without

**[\*34]** establishing that special facts exist under which that source of income would be nontaxable. While petitioners have provided some shipment documents from 1983 with valuation figures on them, such as a Brink's memorandum of agreement and a Wolf D. Barth Co. invoice, petitioners cannot use them to establish their bases for at least four independently sufficient reasons: (1) they provide only evidence of values at the time of shipment, not evidence of adjusted bases; (2) alleged modification or redesign of the gift jewelry pieces before they were sold[33] may have resulted in the removal of materials and consequently reductions to the adjusted bases of many of the pieces, *cf.* Treas. Reg. § 1.61-6(a); (3) the problem of tracing shipped items to individual sale transactions at JFJ and SJC (or even to resale during specific taxable years) is intractable; and (4) we reject the gift jewelry story outright for reasons discussed below. Any attempt to use the Jewellery Studio invoices to establish the items' bases also suffers from the second, third, and fourth of those problems, as well as an additional problem regarding trial testimony about them that we discuss below. The Moozeh Zar and Firoozeh Gold documents are not in evidence for the truth of their cost figures at all.

In any case the gift jewelry story is entirely fanciful. We reject the veracity of the gift jewelry story for the following reasons:

(1) The testimony we heard in support of the gift jewelry story simply lacked credibility. Our observation of the relevant witnesses' demeanor during questioning tended to refute, not confirm, the truth of the gift jewelry story.

(2) The testimony we heard in support of the gift jewelry story was implausible, including for the following reasons:

 (a) Petitioners have not satisfactorily explained why there are references to watches in the memo lines of some of the checks deposited in Rabobank 2472 even though no witness testified that watches were among the gift jewelry. The same is true of numerous other checks with anomalous memo lines in the record, including one for "wine glasses."

---

[33] There is no record, however, of which pieces of jewelry were modified or how they were modified. Petitioners have not explained or substantiated any basis adjustments in their favor that might have resulted from modifying the gift jewelry. *Cf.* § 1016.

**[*35]**

(b) Petitioners have not adequately explained why their customers purportedly used checks so frequently only when they bought gift jewelry but so infrequently for sales in the regular course of business. Shahbaz testified that "we wanted to avoid . . . credit card" processing fees on the gift jewelry. It is unclear, however, why this same consideration would not apply to other sales at SJC. Indeed, Shahbaz testified that SJC "promote[s] mainly check *or credit card*" (emphasis added) instead of cash because "I'm not there often. I don't want to look for money later." While Shahbaz also testified that "we . . . wanted to have a separate account for [gift jewelry proceeds] . . . so we know what we got out of it," maintaining a separate account for the gift jewelry proceeds would not require accepting mainly a single payment method. In addition, petitioners already allegedly maintained the logbook for the purpose of tracking their sales of gift jewelry. Finally, the logbook entries reference checks deposited into more than one account, including Rabobank 2472, SBBT 8226, Chase 8913, and BofA 7088, not a single separate account.

(c) A more plausible explanation for these discrepancies is that JFJ and SJC diverted income from check and cash sales in the regular course of business away from their operating accounts in an attempt to conceal income. Deposits of credit card sale proceeds into JFJ's and SJC's operating accounts regularly and substantially exceeded deposits of customer checks and cash deposits during 2012–14; individual deposits of cash and customer checks were for relatively small amounts. SJC's sales journals identify substantial check and cash sales that do not correspond to the check and cash deposits in its operating account.

(d) RA Hurtado credibly testified that Joseph, Shahbaz, and Mr. Mehrnia never mentioned gift jewelry sales when she interviewed them and that when she asked Shahbaz about why the financial activity in Rabobank 2472 stopped in April 2014, "he indicated that that's when they went straight." We credit RA Hurtado's testimony and interpret Shahbaz's statement as a party admission that he underreported his income from SJC with the intent to evade taxes.

(3) The testimony we heard in support of the gift jewelry story was inconsistent, including for the following reasons:

**[\*36]**

    (a) Shahbaz testified that yellow tags with cost figures written on them were already affixed to the gift jewelry pieces when the gift box was opened, while Joseph testified that they were affixed later.

    (b) Shahbaz testified that SJC "promote[s] *mainly check* or credit card" (emphasis added) as opposed to cash, but the record shows that SJC had minimal check deposits into its business operating account.

    (c) Jamshid testified that he never received any proceeds from sales of the gift jewelry. While Joseph testified that he, Shahbaz, and Shahrokh sent Jamshid $90,000 from the gift jewelry sales in 2014, Joseph also testified that "it was [for] an emergency that we . . . sent him the [$]90,000. He needed some medical attention." In addition, $90,000 is considerably less than Jamshid's purported one-fourth share of the alleged proceeds from the gift jewelry sales: Shahbaz testified that the proceeds totaled about $3 million.[34] The foregoing inconsistencies also render implausible Joseph's testimony that SJS received unreported income (despite Jamshid's not being an owner of SJS) because "[w]e thought we would invest it in something . . . [and later] we will divide it equally [among] the brothers."

    (d) Petitioners argue that the yellow tags were attached to items of gift jewelry, but Anna testified that the yellow tags signified sale items.

    (e) Joseph testified that there were about 1,600 to 1,700 items of gift jewelry in total, but respondent avers that (by his count) the Jewellery Studio invoices "contain approximately 4,250 individual items." The illegibility of portions of the Jewellery Studio invoices prevents us from giving a definitive estimate of the number of items of jewelry they concern, but it is considerably more than 1,700 items. Joseph's testimony is therefore inconsistent with petitioners' argument that the Jewellery Studio

---

[34] Petitioners allege that the gift jewelry sales concluded in 2014, so the size of the alleged $90,000 payment to Jamshid in 2014 cannot be explained by petitioners' not yet having concluded (or at least nearly concluded) their alleged sales of gift jewelry.

**[*37]** invoices provide a straightforward means to establish the cost basis of the alleged gift jewelry.

(4) The testimony we heard in support of the gift jewelry story was vague in some important respects as well, including the following:

(a) We are unsure whether Joseph's testimony that the gift box was unopened was based on any personal knowledge other than his observation of its physical appearance when it was opened.

(b) We are left without any sense of how Mohtaram allegedly stored the gift box for decades or whether and how she ensured it remained unopened.  A better picture of Mohtaram's finances might have helped to establish whether she was likely to have stored valuable jewelry for decades or to have liquidated it before then, but we are left with only a vague sense of her economic means.  In any event we find the testimony that a box containing jewelry and gemstones worth millions of dollars sat unopened for decades to be incredible and not worthy of belief.  Petitioners have not established the source of JFJ's opening inventory when Joseph opened JFJ in 1987, nor have they proven that it was not the jewelry Mohtaram allegedly shipped to Joseph a few years earlier.

(c) Witnesses described the contents of the gift box without much specificity, and the record contains no inventory list of the items in the gift box to supplement that testimony.

(d) The logbook's authorship has not been satisfactorily explained beyond petitioners' allegation that unnamed employees made entries.[35]  No petitioner admitted to making any entries in the logbook.

(e) Despite Joseph's testimony that the jewelry in the gift box could be cross-referenced to the Jewellery Studio invoices via a catalog number, the record reveals little about what the catalog is, how it functions, and the process of matching particular jewelry pieces

---

[35] Shahbaz's testimony that the author of SJC's entries was fired for stealing also raises unanswered questions about the circumstances of the theft and whether the logbook played any role in, or was adversely affected by, the theft.

**[\*38]** to catalog numbers—and ultimately a cost figure—more generally.[36]

(f) Joseph and Shahbaz each explained Mr. Mehrnia's purported ignorance of their alleged gift jewelry sales by stating that Mr. Mehrnia's wife, who is also Joseph and Shahbaz's sister, might have been upset had she learned that she did not receive part of the gift jewelry.  Nonetheless, the alleged gift note states that Mr. Mehrnia's wife was to receive real property instead and that Mohtaram "wish[es] that this division [of property] may not create any issues and problem[s] among" her children, who have "always been . . . supportive of each other."  While conceivably there may still have been reasons for Mr. Mehrnia's wife to be upset, those reasons are speculative on the record before us.

(g) Petitioners allege that Shahrokh or other jewelers at SJC modified the gift jewelry to make it more salable, but they also allege that because the jewelry was dated, out of style, and not salable, they sold it with the objective of recouping as much of its original cost as possible instead of attempting to make a profit over and above its original cost.  The record does not adequately illuminate whether or how these arguments are consistent with each other.

(h) Shahbaz testified that loose gemstones in the alleged gift box were originally packaged in plastic bags and that there was only one yellow tag per plastic bag, not one yellow tag per gemstone.  It is unclear how petitioners are alleging these loose gemstones were segregated from JFJ's and SJC's regular inventories and tracked if each one did not have its own yellow tag.  It is also unclear whether and how Shahbaz's testimony that yellow tags were thrown out at SJC after an item of alleged gift jewelry was sold applies to loose gemstones.

(i) Joseph, Shahbaz, Shahrokh, and Jamshid's other siblings were not witnesses and therefore did not testify about whether or when they received the houses described in the alleged gift note.  No documentary evidence exists on this point either.

---

[36] Shahbaz's inconsistent account avoids this complication because, according to him, "[t]he items were already yellow-tagged" with cost figures written on the tags.

**[\*39]**

(5) At trial, Shahrokh—one of the purported donees of Mohtaram's alleged gift of jewelry, as well as someone who purportedly modified it before it was resold—professed a lack of awareness concerning whether sales of that jewelry ever occurred. He testified that "I believe they have [been] sold, I don't know, but . . . I would imagine, we have sold them off from what I understand."

(6) There is insufficient documentary evidence to support the gift jewelry story. Cf. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946) ("[T]he failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable."), *aff'd*, 162 F.2d 513 (10th Cir. 1947). While our concern is largely general, some specific concerns include the following:

    (a) Petitioners have produced neither SJC's computerized sales invoices and inventory records nor Mr. Mehrnia's digital Quickbooks backup file.

    (b) The only documentary evidence of a gift of jewelry to petitioners in 2010 is the alleged handwritten gift note from Mohtaram, but it is indistinguishable on its face (as translated) from a holographic will. Indeed, Jamshid referred to it as a will in his deposition testimony.

    (c) There is no evidence that Mohtaram ever filed a gift tax return for 2010 or any other year. In addition, the alleged gift note does not provide evidence of a completed gift because we admitted it only to prove Mohtaram's then-existing state of mind (e.g., her intent, motive, or plan), not to prove the fact of a completed gift.

    (d) Much of the documentary evidence petitioners provided tends to record events during or before 1983, but it largely does not help to establish later events central to petitioners' narrative. We are unconvinced that any historical events petitioners may have established are anything more than a smokescreen for their improper income tax reporting.

(7) There is insufficient corroboration by witnesses unrelated to petitioners to support the gift jewelry story. The following considerations are particularly important in this regard:

**[\*40]**

    (a) Testimony by one or more of JFJ's or SJC's nonparty employees or customers during 2012–14 with personal knowledge of the events at issue would have been especially helpful. No such testimony exists, however.

    (b) While Shahbaz testified that an IRS agent observed the gift jewelry, no party called the IRS agent as a witness.

    (c) Mohtaram's testimony would have been helpful to confirm or refute the gift jewelry story. Petitioners could have made an application to the Court to perpetuate her testimony pursuant to Rule 81(a) or Rule 82 before her death. While we do not draw any adverse inference against petitioners on these grounds, Mohtaram's death does not afford petitioners any leeway in meeting their burden of proof. *Cf. Kroner v. Commissioner*, T.C. Memo. 2020-73, at \*9–10 (discussing the importance of hearing a specific person's testimony despite not drawing an adverse inference from the person's absence), *rev'd in part on other grounds*, 48 F.4th 1272 (11th Cir. 2022).

(8) The logbook is in evidence only for the limited purpose of showing petitioners' intent. Nonetheless, viewed in the light of the entire record, it does not demonstrate petitioners' alleged intent to track the sale of gift jewelry, including for the following reasons:

    (a) Joseph's and Shahbaz's testimony about the logbook's creation, maintenance, and purpose simply was not credible.

    (b) The logbook records check sales (allegedly of gift jewelry) but not credit card sales. It would be illogical for the logbook to record only sales via a single payment method if it were intended to track the sale of gift jewelry.

    (c) No witness identified the handwriting in the logbook or named the person or people responsible for making entries in it. Absent testimony from such a person—including as to when the logbook was created and any other circumstances surrounding its creation—the logbook does not convincingly demonstrate petitioners' contemporaneous intent. Petitioners have not adequately proven that the logbook was contemporaneously maintained in view of the lack of weight we give to Joseph's and Shahbaz's testimony.

[*41]

(d) As already discussed, JFJ's and SJC's sales invoices, which might refute or confirm the logbook entries, have not been introduced into evidence. Some of the entries in the logbook correspond to checks whose memo lines mention watches and wine glasses, among other items, but watches, wine glasses, and certain other items mentioned in the checks' memo lines were not among the alleged gift jewelry items.

(e) Joseph testified that the primary purpose of the logbook was to facilitate an equitable division of the proceeds of the gift jewelry, but he also testified that credit card sales of gift jewelry were not recorded in the logbook, which would not facilitate an equitable division of the proceeds. This is especially true with respect to Jamshid, who was involved with neither JFJ nor SJC. Moreover, some of the funds deposited into Rabobank 2472 were used for personal purposes or deposited into JFJ's and SJC's operating accounts.

(9) The gift jewelry story is underinclusive. Joseph, when asked which personal bank accounts received deposits from gift jewelry sales, replied only "Rabobank," which we understand to mean Rabobank 2472. When he was asked, "So any sales of the mother's gifted jewelry went into the Rabobank [2472] account?", he replied, "Yes, it did." We understand this to be a party admission that the gift jewelry story is not applicable to the specific amounts deposited into Chase 8913, SBBT 8226, BofA 7088, and BofA 5186 that respondent identified as taxable. Because petitioners have not offered any other explanation of these specific items, we deem them to have conceded that they are taxable.

Petitioners have made generalized arguments about the reliability of the IRS's examination at the administrative level. These arguments do not avail petitioners because

[a]s a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of [the Commissioner's] motives or of the administrative policy or procedure involved in making his determinations. . . . [A] trial before the Tax Court is a proceeding de novo; our determination as to a [taxpayer's] tax liability must be based on the merits of the case and

**[\*42]** not any previous record developed at the administrative level.

*Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–28 (1974). We are not faced here with the exceptional situation of respondent's making a naked assessment without any rational foundation. *Cf. United States v. Janis*, 428 U.S. 433, 441–42 (1976). To the contrary, there is overwhelming evidence of the correctness of all of respondent's positions in these cases that remain at issue (other than his determination of fraud penalties against Anna and Farahnaz for 2012–14).

### B.  *Guaranteed Payments*

Payments a partner receives from a partnership generally fall into one of three categories. *See Bolles v. Commissioner*, T.C. Memo. 2019-42, at \*19–20. First, a partner may receive payments representing distributions of his or her distributive share of partnership income. *See* §§ 701, 702, 704(b), 731, 736(a)(1). Second, a partner may receive payments in circumstances in which he or she is not treated as a partner. *See* § 707(a). Third, a partner may receive guaranteed payments for services or use of capital that do not represent distributions of partnership income. *See* §§ 707(c), 736(a)(2). A guaranteed payment is not automatically deductible by the partnership making it; nonetheless, if the guaranteed payment would have been deductible if it had been made to a nonpartner, then it is deductible if made to a partner. *See Cagle v. Commissioner*, 539 F.2d 409, 414 (5th Cir. 1976), *aff'g* 63 T.C. 86 (1974).

Respondent determined that Shahbaz and Anna failed to report guaranteed payments of $48,000, $48,000, and $46,000 for 2012, 2013, and 2014, respectively, reflecting the fair market value of their use of 1143 Colina Vista, SJS's partnership property, as their personal residence until mid-December 2014. Shahbaz and Anna do not argue about which of the three just-described categories their personal use of 1143 Colina Vista should fall into.[37] Instead, they argue that as an

---

[37] Petitioners' lack of argument does not mean that the issue is straightforward. *Cf. Pratt v. Commissioner*, 64 T.C. 203, 210 (1975) (holding that payments based on gross rentals "are not determined without regard to the income of the partnership as required by section 707(c) for a payment to a partner for services to be a guaranteed payment"), *aff'd in part, rev'd in part*, 550 F.2d 1023 (5th Cir. 1977); *H.H. Mink & Son Bag Co. v. Commissioner*, T.C. Memo. 1970-177, 1970 Tax Ct. Memo

**[\*43]** alleged factual matter, they lived at 1143 Colina Vista "for less than half of the 36-month period from January 1, 2012, to December 31, 2014." They also argue that there were "nearly two years of renovations" on 1143 Colina Vista, and that they "moved to a home directly across the street" during this time. We take a dim view of Shahbaz and Anna's failure to develop the record adequately in this regard.

If it were true during 2012–14 (or some portion of it) that Shahbaz and Anna resided at another residence and 1143 Colina Vista was under construction, then they could have produced more than self-serving testimony to support those facts. Some documentation concerning the construction almost certainly would have existed. The testimony of nonparty witnesses with knowledge, photographic or video evidence, or other documentary evidence might also have been helpful. Evidence concerning precisely when Shahbaz and Anna lived at one residence or the other is also needed, but Shahbaz's testimony was imprecise.

The failure of proof on this issue leaving the truth shrouded in mystery—and us with a threadbare record at best—must fall on Shahbaz's and Anna's shoulders. At any given time, Shahbaz and Anna either resided at 1143 Colina Vista or they did not, and 1143 Colina Vista either was undergoing renovations or it was not. Shahbaz and Anna's failure to adduce evidence other than their own testimony to help us resolve where they resided during 2012–14—and when they did so— is inexplicable. We will draw an adverse inference against Shahbaz and Anna for failing to develop the record appropriately with respect to their place of residence. We presume that any evidence they could have produced in this regard would have been unfavorable to them. *See Wichita Terminal Elevator Co.*, 6 T.C. at 1165.

On the record before us, we are faced with Shahbaz and Anna's contemporaneous written statements on their income tax returns that their home address was 1143 Colina Vista and their inconsistent, self-serving testimony that they resided at another residence. Shahbaz

---

LEXIS 181, at \*23–25 (characterizing a partner's personal use of a partnership's automobile as income of the partnership); Treas. Reg. § 1.707-1(a) ("A partner who engages in a transaction with a partnership other than in his capacity as a partner shall be treated as if he were not a member of the partnership with respect to such transaction. Such transactions include . . . the rendering of services by the partnership to the partner . . . ."); Rev. Rul. 81-300, 1981-2 C.B. 143 (characterizing partners' receipt of a percentage of gross rentals in exchange for providing management services as guaranteed payments, contrary to *Pratt*). Nonetheless, because petitioners have not argued that an alternative characterization is more appropriate and the analysis would be highly fact intensive, we decline to assume the mantle in the first instance.

**[*44]** and Anna have not met their burden to show they resided somewhere other than 1143 Colina Vista because (1) the testimony we heard simply was not credible, (2) we have drawn an adverse inference against them on account of their failure to develop the record adequately, and (3) their income tax returns have the advantage of contemporaneity.

Shahbaz and Anna also argue that Shahbaz "supervised and managed the team of contractors working at" 1143 Colina Vista and that they moved back to 1143 Colina Vista in 2014, "where [Shahbaz] continued performing repairs." These assertions are similarly unsupported by credible evidence, but more importantly, they are irrelevant: The issue is not whether Shahbaz made some contribution of services to SJS but instead whether he received compensation "determined without regard to the income of the partnership." *See* § 707(c). Shahbaz and Anna have not made any argument that their personal use of 1143 Colina Vista depended on SJS's income, and we conclude that it did not. Shahbaz and Anna also have not taken issue with respondent's methodology for calculating the fair market value of their personal use of 1143 Colina Vista. Finally, petitioners' Simultaneous Opening Brief does not argue that the Code entitles SJS to a deduction in respect of the guaranteed payments it made to Shahbaz and Anna, so we deem that line of argument to be conceded. We uphold respondent's determinations that Shahbaz and Anna failed to report guaranteed payments of $48,000, $48,000, and $46,000 for 2012, 2013, and 2014, respectively.

C.     *NOL Carryforward Deductions*

The deductibility of an NOL, like other deductions, is a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to NOL deductions. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Section 172 allows a taxpayer to deduct an NOL for a taxable year. The amount of the NOL deduction equals the aggregate of the NOL carryovers and carrybacks to the taxable year. *See* § 172(a). Section 172(c) defines an NOL as the excess of deductions over gross income, computed with certain modifications specified in section 172(d). *See Amos v. Commissioner*, T.C. Memo. 2022-109, at *6, *aff'd per curiam*, No. 23-10532, 2024 WL 1406646 (11th Cir. Apr. 2, 2024).

An unused NOL is first required to "be carried to the earliest of the taxable years to which . . . such loss may be carried." § 172(b)(2);

**[\*45]** *McRae v. Commissioner*, T.C. Memo. 2019-163, at \*23. Any excess NOL that is not applied for one year is carried to the then-ensuing year. *See* § 172(b)(2). For the years at issue, absent an election under section 172(b)(3), an NOL must first be carried back two years and then carried over 20 years.[38] *See* § 172(b)(1)(A), (2). A taxpayer claiming an NOL deduction must file with his return "a concise statement setting forth the amount of the net operating loss deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the net operating loss deduction." Treas. Reg. § 1.172-1(c).

"A taxpayer who claims a net operating loss deduction bears the burden of establishing both the existence of the net operating loss and the amount that may be carried over to the year involved." *Chico v. Commissioner*, T.C. Memo. 2019-123, at \*39, *aff'd*, No. 20-71017, 2021 WL 4705484 (9th Cir. Oct. 8, 2021). "Taxpayers cannot rely solely on their own income tax returns to establish the losses they sustained." *Barker v. Commissioner*, T.C. Memo. 2018-67, at \*13, *aff'd*, 853 F. App'x 571 (11th Cir. 2021). A taxpayer "must establish that the NOL was not fully absorbed in the years preceding the particular year for which he seeks the NOL deduction." *Villanueva v. Commissioner*, T.C. Memo. 2022-27, at \*3. In the case of a claimed NOL carryforward deduction, taxpayers must both (1) show convincing evidence that they incurred an NOL in one or more taxable years before the taxable year for which they claim an NOL deduction and (2) prove their income for each taxable year prior to the year for which they claim an NOL carryforward deduction, up to two years before the year in which the earliest NOL was incurred. *See Power v. Commissioner*, T.C. Memo. 2016-157, at \*13–14.

Except to the extent respondent has conceded otherwise,[39] petitioners are not entitled to their claimed NOL carryforward deductions because (1) they have failed to provide sufficient evidence of the NOLs and (2) they have failed to show that any NOL was available to carry forward to 2012–16. Even though the amount of the NOL deduction equals the aggregate of the NOL carryovers and carrybacks to the taxable year, petitioners have not identified the components of

---

[38] The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13302(b), 131 Stat. 2054, 2122, amended section 172(b) by repealing the NOL carryback and allowing for an indefinite carryforward. *See Martin v. Commissioner*, T.C. Memo. 2021-35, at \*19 n.10.

[39] In his Simultaneous Opening Brief, respondent concedes that $237,418 of his $639,482 adjustment to Shahbaz and Anna's claimed NOL deduction for 2012 was erroneous.

**[\*46]** each claimed NOL deduction. In other words, we do not know from which taxable years the alleged NOLs originate and in what amount each separate NOL was applied during 2012–16. We can hardly verify that petitioners' calculations of their NOL deductions are correct if we do not know in which years the alleged NOLs were incurred.

The evidence that petitioners have presented is "disorganized, confusing, and inadequate." *See Larabee v. Commissioner*, T.C. Memo. 1989-298, 1989 Tax Ct. Memo LEXIS 310, at \*7. Petitioners did not attach the detailed computational schedule required by Treasury Regulation § 1.172-1(d) to any of their income tax returns, and we still do not have any reasonable substitute for it. The books and records for petitioners' businesses, as well as petitioners' income tax returns, are unreliable and merit little weight. We have mostly unreliable secondary sources; we do not have many source documents, including receipts, invoices, or canceled checks (other than the canceled checks respondent used to prove unreported income), let alone a summary of those source documents in a usable format. *See Jasperson v. Commissioner*, T.C. Memo. 2015-186, at \*9 ("[The taxpayer] wished to prove his case by submitting hundreds of accounting records from an electronic database as replacements for source documents. . . . [W]ithout any sort of direction as to the contents of these documents, this type of voluminous, unverified, and indiscriminate documentation does not provide adequate substantiation of the items [the taxpayer] reported on his tax returns."), *aff'd*, 658 F. App'x 962 (11th Cir. 2016); *WB Acquisition, Inc. & Subs. v. Commissioner*, T.C. Memo. 2011-36, slip op. at 49 (holding that a general ledger was insufficient to substantiate cost of goods sold because the taxpayers failed to provide "receipts, invoices, canceled checks, or any other evidence to prove the nature of these expenses or whether such expenses were paid"), *aff'd on other issues sub nom. DJB Holding Corp. v. Commissioner*, 803 F.3d 1014 (9th Cir. 2015).

Importantly, while we have heard testimony that SJC used a software program to create sales invoices during 2012–14, petitioners have not produced any of those invoices. The mere fact that NOL deductions are involved does not relieve petitioners from providing the requisite substantiation for the underlying expenses or losses or from proving their income for relevant years. *Cf. A&F Mgmt. Corp. v. Commissioner*, T.C. Memo. 1984-585, 1984 Tax Ct. Memo LEXIS 87, at \*6 ("Our finding as to the deductibility of the amounts claimed by [the taxpayer] as operating expenses will determine the deductibility of the net operating loss claimed by [the taxpayer] . . . .").

[*47] Petitioners have provided some rudimentary calculations, but they contain several defects:

(1) While petitioners' income tax returns do not contain a section 172(b)(3) election, petitioners nonetheless calculated their NOL deductions by carrying forward each alleged NOL, not by first carrying them back two years.

(2) Even assuming arguendo that petitioners incurred NOLs at some point, they have not proven that they remained available to use for 2012–16. A significant portion of the alleged NOLs appears to have originated before or during 2011, but we do not have any records for 2009 or earlier.

(3) Petitioners' calculations do not take into account whether their basis in each partnership or S corporation that they own limits their NOL deductions. *Cf. Bryan v. Commissioner*, T.C. Memo. 2023-74, at *12–15 (considering whether sufficient outside basis existed in upper- and lower-tier partnerships to support the taxpayer's claimed NOL deductions); *Jasperson*, T.C. Memo. 2015-186, at *8–9 ("[The taxpayer] did not accurately account for his basis in his S corporation. Instead he provided the corporation's old tax returns and workpapers . . . to show the presumed calculated value of his basis in the corporation. These documents, without any substantiation of their numeric content, are not a proper means of establishing basis.").

(4) Petitioners appear to allege that some of the NOLs are attributable to Barukh and SJS, but they have conceded that they are not real estate professionals for 2012–14, *cf.* § 469(c)(2), (4), (7), and they have made no effort to show how the passive activity loss limitation under section 469(a)(1) applies.

(5) Petitioners' calculations of their NOLs and claimed NOL deductions do not take into account concessions petitioners made in the Stipulation of Settled Issues, let alone our findings of unreported income. *Cf. Schnackel v. Commissioner*, T.C. Memo. 2024-76, at *12–13.

We are not able to make any estimates of the allowable amounts of NOL deductions, if any, on the wholly inadequate record before us. *Cf. Lehman v. Commissioner*, T.C. Memo. 2010-74, slip op. at 5 (declining to estimate the allowable amounts of NOL deductions where the taxpayers "have proposed no facts that, were we to so find, would allow

**[\*48]** us to make a reasonable estimate of . . . losses"). Petitioners' computational arguments about the effect a disallowance of their NOL carryforward deductions should have on their income tax deficiencies are also wholly without merit.[40]

## V.    *Penalties*

Only two issues remain for our decision. The first is whether petitioners are liable for fraud penalties (or, in the alternative, accuracy-related penalties) for their 2012–14 taxable years. The second is whether Shahbaz, Anna, Shahrokh, and Farahnaz are liable for accuracy-related penalties for their 2015 and 2016 taxable years.

The Commissioner generally bears the burden of production with respect to a penalty or an addition to tax that an individual taxpayer

---

[40] While petitioners' computational arguments would ordinarily be raised and considered in connection with Rule 155 computations, the parties effectively tried some of the computational issues related to petitioners' claimed NOL deductions by consent, and we have adequately considered their arguments. Petitioners' position, which challenges RA Hurtado's calculations at the administrative level and amounts to an argument that disallowing their NOL deductions does not create income tax deficiencies, is highly flawed for at least three reasons, even putting aside that petitioners' focus on events occurring at the administrative level disregards the purpose of our de novo proceedings. *Cf. Greenberg's Express, Inc.*, 62 T.C. at 327–28.

First, petitioners misleadingly conflate Form 1040, line 43, which instructed taxpayers to enter their taxable income as zero in lieu of using a negative number, and Form 4549–A, Income Tax Examination Changes, a worksheet respondent used that does not specify whether zero or a negative number should be entered as taxable income. (The possibility of negative taxable income arose on the face of petitioners' income tax returns because of highly negative numbers entered on Form 1040, line 21, to reflect alleged NOLs.) Whether petitioners' income is appropriately adjusted by the entire amount of the NOL deductions they claimed, or only by what petitioners call the utilized portion of their NOLs, depends directly on whether a negative number or zero is entered as their taxable income on the worksheet. Contrary to petitioners' assertions, respondent should not have adjusted petitioners' income only by the utilized portion of their alleged NOLs because respondent entered their taxable income on the worksheet as a highly negative number derived largely from Form 1040, line 21, not zero. Put differently, respondent effectively adjusted line 21 of Form 1040, not petitioners' income directly. Second, a proper application of a utilization-based method would require petitioners' taxable income to be entered as zero on Form 4549–A, which is less favorable to petitioners than the highly negative number respondent used. Finally, even if a utilization-based method were used, petitioners could not rely on their unadjusted income tax returns to determine the utilized portion of their NOLs for purposes of Rule 155 computations because those unadjusted income tax returns were incorrect. *Cf. Schnackel*, T.C. Memo. 2024-76, at \*12–13. Our holdings in this Opinion, as well as concessions made in the Stipulation of Settled Issues, greatly affect how much of petitioners' alleged NOLs would be considered utilized.

**[\*49]** has contested in his or her petition. *See* § 7491(c); *Funk v. Commissioner*, 123 T.C. 213, 216–18 (2004); *Swain v. Commissioner*, 118 T.C. 358, 363–65 (2002). To satisfy that burden, the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the penalty or addition to tax. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).

The Commissioner's burden of production also includes showing compliance with section 6751(b), which provides that, with certain exceptions not applicable here, the "initial determination" of a penalty or addition to tax must be "personally approved (in writing) by the immediate supervisor of the individual making such determination." *See Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). The Ninth Circuit has held that written supervisory approval must occur "before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment." *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, 161 T.C. 104 (2023).

A. *2012–14: Fraud Penalties*

Section 6663(a) imposes a penalty of 75% of the portion of any underpayment of tax required to be shown on a return that is attributable to fraud. Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing. *See Petzoldt*, 92 T.C. at 698. Fraud is never imputed or presumed. *See Parks v. Commissioner*, 94 T.C. 654, 660 (1990). Rather, "[t]he existence of fraud is a question of fact to be resolved upon consideration of the entire record." *Id.*

To establish fraud, the Commissioner must prove that (1) an underpayment of tax exists for the relevant year and (2) "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Id.* at 660–61. The Commissioner must prove both elements by clear and convincing evidence. *See* § 7454(a); Rule 142(b); *DiLeo*, 96 T.C. at 873; *Petzoldt*, 92 T.C. at 699. The Supreme Court has explained:

> Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere

**[\*50]**   preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 516 (1990) (quoting *Cross v. Ledford*, 120 N.E.2d 118, 123 (Ohio 1954)).

Because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. *See Spies v. United States*, 317 U.S. 492, 499 (1943); *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. The taxpayer's entire course of conduct may be examined to establish the requisite intent. *See Stone v. Commissioner*, 56 T.C. 213, 224 (1971); *Otsuki v. Commissioner*, 53 T.C. 96, 106 (1969). Mere suspicion, however, is not enough to prove fraud. *See Katz v. Commissioner*, 90 T.C. 1130, 1144 (1988).

Courts usually rely on several nonexclusive indicia (or badges) of fraud in deciding whether a taxpayer had fraudulent intent. *See Niedrighaus v. Commissioner*, 99 T.C. 202, 211 (1992). These badges of fraud include (1) understated income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing income or assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) dealing in cash; (9) failing to make estimated tax payments; and (10) filing false documents. *See Estate of Trompeter v. Commissioner*, 279 F.3d 767, 773 (9th Cir. 2002), *vacating and remanding* 111 T.C. 57 (1998); *Bradford v. Commissioner*, 796 F.2d at 307–08; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988). The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211. The sophistication of the taxpayer is also relevant. *See Stephenson v. Commissioner*, 79 T.C. 995, 1006 (1982), *aff'd per curiam*, 748 F.2d 331 (6th Cir. 1984); *Holmes v. Commissioner*, T.C. Memo. 2012-251, at \*31, *aff'd*, 593 F. App'x 693 (9th Cir. 2015).

"Section 6663(a) . . . applies to a specific, culpable taxpayer," *Murrin v. Commissioner*, T.C. Memo. 2024-10, at \*7, *appeal docketed*, No. 24-2037 (3d Cir. June 12, 2024), and is "tied to the culpability of a particular taxpayer," *id.* at \*9. Section 6663(c) provides that in the case of a joint return, the fraud penalty "shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such

[*51] spouse." Our discussion therefore addresses each petitioner's liability for the fraud penalty separately.

If the Commissioner establishes that any portion of the underpayment is attributable to fraud, then the entire underpayment is treated as due to fraud unless the taxpayer can establish by a preponderance of the evidence that some portion of it is not attributable to fraud. § 6663(b). In addition, no fraud penalty may be imposed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." § 6664(c)(1).

Respondent has met his burden of production for the fraud penalties he determined against petitioners. We have already found that respondent has clearly and convincingly demonstrated that underpayments of tax exist for 2012, 2013, and 2014 with respect to each petitioner. As we will discuss below, respondent has also adduced some evidence of fraud with respect to each petitioner, including understating income. Finally, respondent has shown that the relevant immediate supervisor timely approved the assertion of fraud penalties against each petitioner for 2012, 2013, and 2014 in accordance with section 6751(b), and petitioners have not argued or shown otherwise. As we now explain, however, respondent has met his burden of proof to demonstrate fraud clearly and convincingly with respect to four of the six petitioners, but not with respect to two of them.

### 1.   *Joseph*

We agree with respondent that Joseph is liable for fraud penalties for 2012, 2013, and 2014. Joseph certainly engaged in a pattern of understating his and Lilly's income by substantial amounts, and the understatements were intentional because Joseph caused JFJ to report its credit card sales as income, but not most of its check sales. Joseph actively concealed the unreported income by diverting it into Rabobank 2472 and other personal accounts of which Mr. Mehrnia was unaware. To create the appearance of loan disbursements, he returned some untaxed proceeds to JFJ by writing checks from Rabobank 2472 referencing Jamshid or a loan and depositing those checks in JFJ's operating account. He invested other untaxed funds in SJS, which in turn invested them in residential real estate. Joseph also wrote checks for personal purposes from Rabobank 2472.

**[\*52]** When questioned by RA Hurtado, Joseph continued to conceal the untaxed income by incorrectly telling her that JFJ had only one business operating account. In fact, Joseph deposited JFJ's items into multiple accounts. He also falsely stated that a loan carried on JFJ's books was administered by Jamshid and represented an advance on an inheritance. Despite RA Hurtado's repeated written requests for information about sources of nontaxable income, such as gifts or inheritances, Joseph never mentioned any aspect of the gift jewelry story to RA Hurtado.

RA Hurtado discovered by summoning bank records that Rabobank 2472 was funded by scores of deposited items from JFJ's and SJC's businesses, not loan proceeds from Jamshid. Jamshid later credibly testified that he was unaware of all of the business dealings in his name. Joseph's repeated use of Jamshid's name without Jamshid's knowledge was fraudulent (regardless of whether it constituted an illegal activity) because it was calculated to conceal Joseph's unreported income in the guise of a loan. It was also fraudulent because the signature card for SBBT 8226, on which Joseph's signature appears twice, contains a false certification that Jamshid is not subject to backup withholding because he is "a U.S. person (including a U.S. resident alien)" and wrongly leaves unchecked a box stating that "I am not a U.S. citizen or resident." Even at trial, Joseph continued to refer falsely to SBBT 8226 as "Jamshid's Trust."

Petitioners now rely on the gift jewelry story instead of arguing that JFJ received nontaxable loan proceeds, so Joseph's initial explanation of his behavior to RA Hurtado constitutes an inconsistent explanation. That explanation was also implausible because Joseph used much of the unreported income to invest in real estate, not in JFJ. Joseph has continued this pattern by giving inconsistent and implausible testimony in support of the gift jewelry story at trial. Moreover, Joseph has failed to cooperate with these proceedings by failing to produce any sales invoices or customer receipts, which might refute the gift jewelry story or undermine petitioners' claimed NOL deductions. Instead of cooperating, he has opted to give us implausible and inconsistent testimony with respect to those records' whereabouts. *See supra* note 20. Joseph also dealt in cash because JFJ's sales logs show cash sales that are unmatched by a corresponding bank deposit. Furthermore, he claimed inflated NOL deductions and failed to keep adequate records to substantiate them. Joseph's entire course of conduct demonstrates that he intended to evade income taxes he knew to be owing on JFJ's check sales and that he did so through conduct

[*53] designed to conceal, mislead, or otherwise prevent the collection of those taxes. Joseph has not shown that any portion of the underpayments is not attributable to fraud or is attributable to reasonable cause and good faith. Joseph is liable for the section 6663 fraud penalties on his and Lilly's total underpayment for each of 2012, 2013, and 2014.

2.    *Lilly*

Lilly is also liable for the fraud penalties for 2012, 2013, and 2014. Lilly understated her and Joseph's income for those years by substantial amounts, and the understatements could not have been unwitting. Lilly owned a 30% interest in JFJ, held herself out as JFJ's owner, worked at JFJ (including writing sales invoices), and was considered the most senior person working when she was working. She was aware of Joseph's real estate dealings because she executed interspousal transfer deeds in respect of residential properties that Joseph purchased. Even though she worked part time at JFJ, she was aware that JFJ was much more profitable than her and Joseph's tax returns reflected.

Lilly concealed her assets from the Government through SBBT 8226 while selectively revealing them to a bank in connection with a loan application. She has failed to cooperate with these proceedings by failing to produce any sales invoices or customer receipts. At trial she also misleadingly downplayed her involvement at JFJ. For example, when asked whether she "ever [got] any accreditations in the jewelry industry," she mentioned getting a gemology degree from GIA "in the February or January of this year." Nonetheless, the record reveals that she has been a GIA alumni member since 2007. Lilly also claimed inflated NOL deductions and failed to keep adequate records to substantiate them. Lilly has not shown that any portions of the underpayments are not attributable to fraud or are attributable to reasonable cause and good faith. Lilly is liable for the section 6663 fraud penalties on her and Joseph's entire underpayments for 2012–14.

3.    *Shahbaz*

Respondent is correct that Shahbaz is liable for the fraud penalties for 2012, 2013, and 2014. Shahbaz not only engaged in a pattern of understating his and Anna's income by substantial amounts, but he also caused SJC to report very little of its check and cash sales as income. Shahbaz actively concealed the income by diverting it into Rabobank 2472 and other personal accounts of which Mr. Mehrnia was

[*54] allegedly unaware. He invested much of these untaxed proceeds in SJS and also returned some to SJC in the guise of a loan from Jamshid, the latter of which demonstrates forethought about how he would respond if he were questioned about those transactions.

When questioned by RA Hurtado, Shahbaz continued to conceal the untaxed income by incorrectly stating to her that SJC had only one business operating account. He also falsely stated that a loan carried on SJC's books represented an advance on his future inheritance from his father's estate. Shahbaz never mentioned any aspect of the gift jewelry story. When RA Hurtado confronted him with evidence of business deposits into Rabobank 2472, however, he made an admission to the effect that he underreported his income from SJC with the intent to evade tax.

Petitioners, including Shahbaz, now rely on the gift jewelry story instead of arguing that SJC received nontaxable loan or inheritance proceeds, so Shahbaz's initial explanation of his behavior to RA Hurtado constitutes an inconsistent explanation. Shahbaz gave inconsistent and implausible testimony in support of the gift jewelry story. Shahbaz also dealt in cash because SJC's sales journals identify substantial cash and check sales that do not correspond to the cash and check deposits in its operating account. In addition Shahbaz has failed to cooperate with these proceedings by failing to produce any sales invoices, inventory records, or customer receipts. Shahbaz also claimed inflated NOL deductions and failed to keep adequate records to substantiate them. Shahbaz's entire course of conduct demonstrates that he intended to evade income tax he knew to be owing on SJC's check and cash sales and that he did so through conduct designed to conceal, mislead, or otherwise prevent the collection of that tax. Shahbaz has not shown that any portions of the underpayments are not attributable to fraud or are attributable to reasonable cause and good faith. Shahbaz is liable for the section 6663 fraud penalties on his and Anna's total underpayments.

### 4. *Anna*

We part ways with respondent on the matter of Anna's liability for the fraud penalties for 2012–14. Respondent argues that Anna is liable for the section 6663 fraud penalties because she understated her and Shahbaz's income, maintained inadequate records, and gave implausible or inconsistent explanations of her behavior.

**[\*55]** While Shahbaz and Anna substantially understated their income and failed to substantiate their claimed NOL deductions, both of which certainly raise suspicions about what Anna knew and her intent, we are ultimately unconvinced that respondent has proven fraud. The heart of respondent's argument is that Anna must have known about, or willfully ignored, the understatements of income on her and Shahbaz's income tax returns because her work at SJC included bookkeeping. Without more foundation about what Anna knew or her lifestyle, however, the probative value of Anna's part-time work at SJC is limited. It is unclear, for example, to what extent Anna's bookkeeping and other work at SJC gave her insight into SJC's operating results. This is especially true in view of Joseph and Shahbaz's alleged misleading of Mr. Mehrnia. *See supra* note 14 and accompanying text. Virtually no evidence of Anna's lifestyle has been presented. Furthermore, Anna may not have been aware of funds invested in SJS, a real estate partnership of which she was not a partner.

Respondent also argues that Anna testified inconsistently with her income tax returns that she did not live at 1143 Colina Vista during 2012–14. Likewise, respondent argues that Anna should have been aware that she understated her income by at least the amount of the guaranteed payments respondent determined against her because she lived in a house owned by SJS. We resolved the guaranteed payments issue, however, on the basis of petitioners' failure to meet their burden of proof, not on the basis of a conclusive finding that Shahbaz and Anna lived at 1143 Colina Vista. While petitioners had the burden of proof on the guaranteed payments issue, respondent has the burden of proof on the imposition of fraud penalties. Nonetheless, respondent has not developed the record much more than petitioners in this regard. In addition, even if Shahbaz and Anna resided at 1143 Colina Vista as respondent alleges, there is no evidence that Anna knew SJS owned it. We need not consider whether Anna is liable for an accuracy-related penalty for 2012, 2013, and 2014 because "[i]n the case of a joint return where one spouse is found liable for fraud, the accuracy-related penalty cannot be imposed on the other spouse." *Graham v. Commissioner*, T.C. Memo. 2005-68, slip op. at 51, *aff'd*, 257 F. App'x 4 (9th Cir. 2007); *see* Treas. Reg. § 1.6662-2(a) ("No accuracy-related penalty may be imposed on any portion of an underpayment of tax on which the fraud penalty set forth in section 6663 is imposed."); *see also* § 6663(c).

[*56]       5.   *Shahrokh*

Shahrokh, however, is liable for the fraud penalty for each of 2012, 2013, and 2014.  Shahrokh engaged in a pattern of substantially understating his and Farahnaz's income.  Although we accept that there was a division of labor at SJC between Shahbaz and Shahrokh and that Shahrokh focused his efforts on jewelry design, the record nonetheless reveals Shahrokh's awareness that SJC's income was significantly understated.

First, Shahrokh's constant work on SJC's jewelry necessarily made him aware that SJC was much more profitable than he claimed on his income tax returns.  Second, Shahrokh was a partner of SJS, which received much of SJC's profits as capital that it used to make real estate investments, and Shahrokh confirmed he was aware that proceeds from jewelry sales were used to purchase property.  Third, Shahrokh's signature appears on the November 18, 2009, loan agreement that falsely purports to memorialize a loan with Jamshid.  Fourth, Shahrokh held a power of attorney over SBBT 8226, which played a key role in the underreporting scheme.  Finally, even though Joseph and Shahbaz were the only named accountholders on Rabobank 2472, Shahrokh has never argued or testified that the income deposited in it is attributable only to them and not to him.[41]  His silence on the matter stands in stark contrast to Jamshid's disclaimer of knowledge about even personal bank accounts in his own name.  Likewise, Shahrokh's testimony that he was unaware that Joseph and Shahbaz were making deposits of jewelry sale proceeds into personal bank accounts is implausible except to the extent that unawareness might have been due to willful blindness.

Shahrokh concealed income and assets in SBBT 8226, an account over which he held a power of attorney, and in Rabobank 2472 through his reliance on Shahbaz and Joseph to use its funds to make investments into SJS, a real estate partnership of which he was a partner.  Shahrokh also dealt in cash because SJC's sales journals identify substantial cash sales that do not correspond to the cash deposits in its operating account.  Moreover, Shahrokh has failed to cooperate with these proceedings by failing to produce any sales invoices or customer receipts.  Shahrokh also took inflated NOL deductions and failed to keep adequate records to substantiate them.  Shahrokh has not shown that any portions of the

---

[41] Similarly, there is no evidence that he has demanded SJC to provide him with an equitable accounting.

**[*57]** underpayments are not due to fraud, and he is liable for the section 6663 fraud penalties on his and Farahnaz's total underpayments for 2012, 2013, and 2014.

### 6.  *Farahnaz*

Respondent argues that Farahnaz understated her and Shahrokh's income and gave implausible or inconsistent explanations at trial. While it is true that Farahnaz understated her income, we are most interested in whether that proves she intended to evade tax known to be owing. Respondent points out that Farahnaz worked at SJC and there is some evidence that she was informed about the alleged gift of jewelry. Therefore, respondent argues, "she was aware of SJC's use of the [gift] jewelry in its inventory and sales," and further, "[g]iven how she was informed of the alleged gift, it is implausible that she was unaware of the residential real estate acquisitions of SJS Group during the years at issue."

Respondent, however, assumes the truth of the gift jewelry story for purposes of proving Farahnaz's liability for the fraud penalties, even though respondent otherwise denies its truth and we find it to be implausible. In addition, any inference about what Farahnaz might have known from her work at SJC is speculative in view of respondent's concession that "she may not have been thoroughly involved with the business."

Farahnaz may have given inconsistent testimony by contradicting the parties' stipulation that she worked at SJC from 2011 to 2017, but even assuming arguendo that it is appropriate to consider this inconsistency for purposes of imposing the fraud penalty, it does not supply clear and convincing evidence of fraud, either standing alone or in combination with the other modest evidence respondent has adduced. There is no evidence that Farahnaz is sophisticated about tax, financial, or business matters, and there is at least some evidence that she simply signed tax returns presented to her by others. We also have virtually no information about Farahnaz's lifestyle.

On the basis of the entire record, respondent has not clearly and convincingly demonstrated that Farahnaz intended to evade tax known to be owing through conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Farahnaz is not liable for the section 6663 fraud penalties. We need not consider whether Farahnaz is liable

**[\*58]** for the accuracy-related penalty for any year for reasons already stated in connection with Anna.

B.    *2015 and 2016: Accuracy-Related Penalties*

The last issue remaining for our decision is whether Shahbaz, Anna, Shahrokh, and Farahnaz are liable for accuracy-related penalties for their 2015 and 2016 taxable years.  We hold that they are.

With one exception, respondent determined section 6662 accuracy-related penalties on grounds of underpayments due to substantial understatements of income tax, *see* § 6662(b)(2), (d), or in the alternative, on grounds of negligence or disregard of rules or regulations, *see* § 6662(b)(1), (c).  For Shahrokh and Farahnaz's 2016 taxable year, however, respondent determined the accuracy-related penalty only on grounds of negligence or disregard of rules or regulations.

Respondent bears the burden of production with respect to the accuracy-related penalties.  *See* § 7491(c).  Once respondent comes forward with sufficient evidence showing that it is appropriate to impose a particular penalty, petitioners have the burden of proof to show that respondent's penalty determination is incorrect, including the burden of proving that penalties are inappropriate because of reasonable cause. *See Higbee*, 116 T.C. at 446–47.  Respondent complied with the written supervisory approval requirements of section 6751(b) for the accuracy-related penalties he determined against Shahbaz, Anna, Shahrokh, and Farahnaz for 2015 and 2016.

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable to any substantial understatement of income tax, *see* § 6662(b)(2), or negligence or disregard of rules or regulations, *see* § 6662(b)(1).  An understatement is substantial if it exceeds the greater of (1) 10% of the tax required to be shown on the return for the taxable year, or (2) $5,000.  *See* § 6662(d)(1)(A). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, and disregard includes any careless, reckless, or intentional disregard.  *See* § 6662(c).  Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly.  *See* Treas. Reg. § 1.6662-3(b)(1). Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent

**[\*59]** person to be "too good to be true" under the circumstances. *See id.* subdiv. (ii). Only one accuracy-related penalty for a given year may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground. *See* Treas. Reg. § 1.6662-2(c). Petitioners have not argued in their Simultaneous Opening Brief that any recognized exception, such as reasonable cause and good faith, applies. *Cf.* § 6664(c). Petitioners have therefore forfeited that line of argument.

We will first address the ground of negligence or disregard of rules or regulations for Shahbaz and Anna's 2015 and 2016 taxable years and Shahrokh and Farahnaz's 2015 and 2016 taxable years. Shahbaz, Anna, Shahrokh, and Farahnaz failed to substantiate their NOLs for those years, and the records they have presented are disorganized, confusing, and inadequate. Indeed, Shahbaz admitted that SJC conducted sloppy bookkeeping, and Shahrokh admitted that he was essentially uninvolved with SJC's finances. Shahbaz, Anna, Shahrokh, and Farahnaz also disregarded a regulation requiring a detailed computational schedule for their claimed NOL deductions to be attached to their tax returns, and they still have not produced any adequate substitute. Finally, they ignored that it was too good to be true for profitable businesses for which there is no credible evidence of economic losses for any year to simultaneously receive the benefit of substantial NOL deductions each year. Respondent's determinations of accuracy-related penalties for 2015 and 2016 are therefore sustained on grounds of negligence or disregard of rules or regulations.

We will also address the taxable years for which respondent has imposed an accuracy-related penalty on grounds of substantial understatement of income tax (Shahbaz and Anna's 2015 and 2016 taxable years and Shahrokh and Farahnaz's 2015 taxable year). The understatements for Shahbaz and Anna's 2015 taxable year and Shahrokh and Farahnaz's 2015 taxable year are substantial as an arithmetic matter. Because Shahbaz, Anna, Shahrokh, and Farahnaz have not argued or shown that any exception applies, respondent's determinations of accuracy-related penalties for those years are sustained on grounds of substantial understatements of income tax. We also sustain respondent's determination of an accuracy-related penalty on grounds of substantial understatement of income tax for Shahbaz and Anna's 2016 taxable year to the extent that Rule 155 computations confirm that the understatement is substantial.

**[\*60]** We have considered the parties' other arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*